ACCEPTED
03-15-00271-CV
7576132
THIRD COURT OF APPEALS
AUSTIN, TEXAS
10/28/2015 11:38:12 AM
JEFFREY D. KYLE
CLERK

NO. 03-15-00271-CV

**IN THE
THIRD COURT OF APPEALS
AUSTIN, TEXAS**

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
10/28/2015 11:38:12 AM
JEFFREY D. KYLE
Clerk

**CYNTHIA WALKER, Individually and on Behalf of the ESTATE OF NORMAN WALKER; STEPHEN WALKER; STEPHANIE WALKER HATTON; JORDAN WALKER; and CAREN ANN JOHNSON
APPELLANTS**

**V.**

**UME, INC. d/b/a CAMP HUACO SPRINGS; WWGAF, INC. d/b/a ROCKIN' RIVER RIDES; WILLIAM GEORGE RIVERS; and RICHARD DUANE RIVERS
APPELLEES**

**ON APPEAL FROM THE 433RD JUDICIAL DISTRICT COURT, COMAL COUNTY, TEXAS, HON. DIB WALDRIP, PRESIDING**

**APPELLANTS' BRIEF**

Clark Richards
State Bar No. 90001613
crichards@rrsfirm.com
Richards Rodriguez & Skeith, LLP
816 Congress Ave., Suite 1200
Austin, Texas 78701
Fax (512) 476-0005
Tel (512) 476-1513
**ATTORNEY FOR APPELLANT**

**ORAL ARGUMENT REQUESTED**

## IDENTITY OF PARTIES AND COUNSEL

**Trial Court**:
433rd District Court, Comal County, Texas

**Plaintiffs/Appellants**:
Cynthia Walker, Individually and on Behalf of the Estate of Norman Walker; Stephen Walker; Stephanie Walker Hatton; Jordan Walker; and Caren Ann Johnson

**Trial Counsel for Plaintiffs**:

Mark R. Mueller
State Bar No. 14623500
Mueller Law, PLLC
404 West 7th Street
Austin, Texas 78701
Tel (512) 478-1236
Fax (512) 478-1473
mmueller@muellerlaw.com
mark@voodoocowboy.com

Clark Richards
State Bar No. 90001613
Richards, Rodriguez & Skeith, LLP
816 Congress Avenue, Suite 1200
Austin, Texas 78701
Tel (512) 476-0005
Fax (512) 476-1513
crichards@rrsfirm.com

**Appellate Counsel for Appellants:**
Clark Richards
State Bar No. 90001613
Richards, Rodriguez & Skeith, LLP
816 Congress Avenue, Suite 1200
Austin, Texas 78701
Tel (512) 476-0005
Fax (512) 476-1513
crichards@rrsfirm.com

**Defendant/Appellee:**
WWGAF, Inc. d/b/a Rockin' R River Rides

**Trial/Appellant Counsel for Appellee:**
Andres R. Gonzalez
State Bar No. 24032240
agonzalez@cbylaw.com
Karen L. Landinger
State Bar No. 00787873
klandinger@cbylaw.com
Cokinos Bosien & Young
10999 West IH-10, Suite 800
San Antonio, Texas 78230
Tel (210) 293-8700
Fax (210) 293-8733

**Defendants/Appellees:**
UME, Inc. d/b/a Camp Huaco Springs, Williams George Rivers and Richard Duane Rivers

**Trial/Appellant Counsel for Appellees:**
Willie Ben Daw, III
State Bar No. 05594050
wbdaw@dawray.com
C. Thomas Valentine
State Bar No. 00786303
tvalentine@dawray.com
Kyle D. Giacco
State Bar No. 07839150
Kgiacco@dawray.com
5718 Westheimer, Suite 1750
Houston, Texas 77057
Tel (713) 266-3121
Fax (713) 266-3188

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL ........................................................... ii

TABLE OF CONTENTS .................................................................................... iv

INDEX OF AUTHORITIES ............................................................................... vii

STATEMENT OF THE CASE ............................................................................ ix

STATEMENT REGARDING ORAL ARGUMENT .............................................. x

ISSUES PRESENTED ....................................................................................... xi

STATEMENT OF FACTS ................................................................................... 1

SUMMARY OF ARGUMENT ............................................................................. 8

ARGUMENT ..................................................................................................... 10

    I.     Standard of Review ............................................................................... 10

        A.    The Court should reverse because there is more than a scintilla of evidence to support a question of fact for trial. ................................. 10

    II.    Appellees' Duty ..................................................................................... 10

        A.    Appellees had a duty because they were aware of a dangerous condition that was unknown to Appellants. ..................................... 10

        B.    Appellees had a duty to warn Appellants because they created a dangerous situation. .......................................................................... 12

        C.    Appellees had a duty to make Camp Huaco Springs safe because they controlled the conduct of its visitors......................................... 13

        D.    The co-owner of Camp Huaco Springs testified that he had a duty to make the Walkers' and the Johnsons' stay as safe has he can. ........ 13

    III.    Appellees' Breach .................................................................................. 14

        A.    Camp Huaco Springs failed to take any action to make the premises safe for its visitors............................................................................ 14

        B.    Camp Huaco Springs failed to monitor weather warnings............... 15

C.  Camp Huaco Springs provided no flood safety information............16

D.  Camp Huaco Springs had no onsite personnel at night....................16

E.  The summary judgment evidence establishes that Camp Huaco Springs took no action to discharge its duties. .................................17

IV. Appellees' Breach Caused Damages ........................................................18

A.  Appellants suffered personal injury, wrongful death, and property damages as a result of the failure of Camp Huaco Springs to fulfill its duty to them. .................................................................................18

V.  CPRC Chapter 75 Does Not Apply .........................................................18

A.  The Recreational Use Statute does not apply because the premises is not agricultural land. ..........................................................................18

B.  The insurance provisions of the Recreational Use Statute do not apply to commercial recreation businesses. ......................................19

C.  The Texas Supreme Court recently clarified the application of the Recreational Use Statute. ................................................................20

D.  Camp Huaco Springs is not in its natural state nor is it removed from human habitation. ............................................................................22

E.  Sleeping in a house trailer is not a recreational use..........................22

VI. Appellees' Gross Negligence ..................................................................24

A.  Even if the Recreational Use Statute applies, there is sufficient evidence to establish gross negligence. ............................................24

VII. Liability of the Rivers Brothers and WWGAF .........................................26

A.  Under the terms of the lease, the Rivers brothers and WWGAF/Rockin' R are occupants of the Camp Huaco Springs premises. .............................................................................................26

v

B. WWGAF/Rockin' R engages in business operations on the Camp Huaco Springs premises. ...................................................................27

C. There is a question of fact as to a joint enterprise between UME, Inc. and WWGAF/Rockin' R. ..............................................................28

D. The Walkers purchased a combined package from "Camp Huaco Springs" that including an RV park stay and river rafting. ...............29

VIII. Testimony of Comal County Sheriff Personnel..........................................30

A. The testimony of Deputy Cline and Sergeant Prescott do not provide grounds for summary judgment.......................................................30

CONCLUSION ...........................................................................................................31

PRAYER .....................................................................................................................32

CERTIFICATE OF COMPLIANCE.......................................................................34

APPENDIX .................................................................................................................36

vi

# INDEX OF AUTHORITIES

## Cases

*Boerjan v. Rodriguez*,
436 S.W.3d 307 (Tex. 2014) ...............................................................................10

*Chrysler Corp. v. Dallas Power & Light Co.*,
522 S.W.2d 742 (Tex. App – Eastland 1975, n.r.e.) ..........................................12

*City of Waco v. Kirwan*,
298 S.W.3d 618 (Tex. 2009) ....................................................................... 11, 12

*County of Cameron v. Brown*,
80 S.W.3d 549 (Tex. 2002) ...............................................................................27

*Howard v. E. Tex. Baptist Univ.*,
122 S.W.3d 407 (Tex. App. Eastland 2003, no pet.) ..........................................20

*McMillan v. Parker*,
910 S.W.2d 616 (Tex. App. – Austin 1995, writ denied) ...................................20

*Merriman v. XTO Energy, Inc.*,
407 S.W.3d 244 (Tex. 2013) ..............................................................................10

*Shell Oil Co. v. Khan*,
138 S.W.3d 288 (Tex. 2004) ..............................................................................26

*State v. Schumake*,
199 S.W.3d 279 (Tex. 2006) ................................................................... 24, 25, 26

*Suarez v. City of Texas City*,
465 S.W.3d 623 (Tex. 2005) ....................................................................... 11, 12

*Texas DOT v. Able*,
35 S.W.3d 608 (Tex. 2000) ...............................................................................28

*Univ. of Tex. at Arlington v. Williams*,
459 S.W.3d 48 (Tex. 2015) ........................................................... 20, 21, 22, 23

*Wilson v. Texas Parks & Wildlife Dep't*,
  8 S.W.3d 634 (Tex. 1999) ...................................................................13

**<u>Statutes</u>**

Civil Practice & Remedies Code Chapter 75...................................... passim

Texas Transportation Code §501.002.....................................................23

## STATEMENT OF THE CASE

This is a lawsuit for personal injuries, property damage, and wrongful death arising out of a 2010 flood in Comal County.  Plaintiffs filed suit in 2012. (CR 13-25).  The trial court granted summary judgment as to one defendant on March 10, 2015. (CR 2172; App. Tab 1).  The trial court granted summary judgment as to the remaining defendants on March 26, 2015. (CR 2194-2201; App. Tab 2).  Plaintiffs filed a Second Amended Petition with additional causes of action prior to the orders granting summary judgment, therefore the summary judgment orders did not dispose of the entire case. (CR 1847-1864).   On April 21, 2015, the trial court entered an order striking the Second Amended Petition, disposing of all remaining claims. (CR 2259).

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Because there are numerous points of appeal relating to a wide range of issues presented and the status of various parties, Appellants urge the Court to grant oral argument to give the parties an opportunity to address any questions raised by the briefing and the record.

# ISSUES PRESENTED

1)    The summary judgment evidence created a question of fact for trial on all elements for a claim of landowner or occupant liability.

2)    Civil Practice & Remedies Code Chapter 75, referred to as the Recreational Use Statute, does not apply to this case. (App. Tab 6).

3)    If the Recreational Use Statute does apply, the summary judgment evidence created a question of fact for a claim of gross negligence.

4)    All of the appellees are subject to liability because UME, Inc., WWGAF, Inc., Richard Rivers, and William Rivers are all occupants of the Camp Huaco Springs premises.

5)    Alternatively, the summary judgment evidence established a question of fact for a claim that WWGAF, Inc., and UME, Inc. are in a joint enterprise such that they are both liable to the Appellants.

6)    The testimony of Comal County Sheriff Department personnel does not establish grounds for summary judgment.

## STATEMENT OF FACTS

1)      In the early morning hours of June 9, 2010, heavy rains resulted in a flash flood on the Guadalupe River in the vicinity of New Braunfels in Comal County. Cynthia Walker and her husband Norman Walker were sleeping in their 38 foot "5th Wheel" RV house trailer parked in a space rented from and located in Camp Huaco Springs on River Road adjacent to the Guadalupe River. (CR 1375-79; App. Tab 4). Cynthia's brother Terry Johnson and his wife Caren Johnson were sleeping in their RV house trailer in an adjacent space. (CR 1376; App. Tab 4). When the Walkers and the Johnsons woke up, the flood water was already up to the wheels of their house trailers and rising so fast that before they could exit, the water was coming inside the trailers. (CR 1379; App. Tab 4). During their attempted escape, the Walkers and the Johnsons, along with their trucks and RV house trailers, were swept downstream resulting in the death of Norman Walker and severe personal injuries to the others. (CR 1380-84; App. Tab 4; CR 1733-35). In this lawsuit, Cynthia Walker, Caren Johnson, and the surviving children of Norman Walker seek personal injury, property loss, and wrongful death damages from the parties who controlled the premises and operated the business that rented them the RV trailer house parking spaces, which are UME, Inc. d/b/a Camp Huaco Springs, WWGAF, Inc. d/b/a Rockin' R River Rides, and the owners of these entities, Richard and William Rivers. (CR 13-25, 1011-26).

1

2) Appellant Cynthia Walker is a retired Wichita Falls police sergeant who suffers from multiple sclerosis. (CR 1373; App. Tab 4). Two years before his death Norman Walker also retired from the Wichita Falls police department as a detective. (CR 1373; App. Tab 4). Cynthia and Norman had acquired a two night stay and river rafting trip at Camp Huaco Springs through a silent auction and contacted Camp Huaco Springs through its website to schedule their stay. (CR 1375; App. Tab 4). When the Walkers and the Johnsons arrived, Camp Huaco Springs' personnel directed them to two assigned paved concrete RV parking spots. (CR 1376-77; App. Tab 4; CR 2226-33).[1] None of the four had ever been to Camp Huaco Springs, therefore they were unaware that they were in a flash flood prone area. (CR 1375-76; App. Tab 4). Camp Huaco Springs provided no safety information and posted no warnings about the flash flood prone premises. (CR 1783-84, 1798-99). Other RV parks routinely provide written safety instructions and have 24-hour onsite personnel in case of emergencies such as severe weather. (CR 1389-90; App. Tab 4). In fact, when Cynthia and Norman Walker stayed at an RV park in Kansas, the RV park had provided information on the risk of tornados and when a tornado warning occurred, an RV park employee came to

---

[1] The trial court partially granted Plaintiffs' motion to supplement the summary judgment record, to include the exhibits to Cynthia Walker's deposition which had not been filed with the initial summary judgment evidence. (CR 2263). The exhibits to Cynthia Walker's deposition are included at CR 2226-33 (App. Tab 5) and include photos of the paved location of their trailer homes when the flood occurred.

2

their trailer to warn them. (CR 1382, 1389-90; App. Tab 4). Camp Huaco Springs had no flood warning system, provided no safety information, posted no warnings about the risk of flood, and had no 24-hour onsite personnel. (CR 1783-84, 1798-99).

3)     The owners and operators of Camp Huaco Springs were aware that the location where they instructed the Walkers and the Johnsons to park was subject to flash flooding because there had been previous flash floods in that location which were twice as bad as the June 2010 flood. (CR 1746, 1785). Furthermore, in the Camp Huaco Springs lease, UME, Inc. and the Rivers brothers agreed that they had full knowledge of the high water conditions that occur on the premises. (CR 1412). Richard Rivers, one of the owners of Camp Huaco Springs, testified that he has a responsibility to make their stay as safe as possible. (CR 1772). Despite the prior floods at Camp Huaco Springs, the operators never took any steps to warn their visitors or reduce the flood risks at the premises. (CR 1747, 1749, 1783, 1799).

4)     At 10:34 AM on June 8, 2010, the National Weather Service issued a flash flood watch for New Braunfels and Comal County. (CR 409-10). Between 11:00 AM that morning and 6:15 AM June 9, 2010, the National Weather Service issued twelve more bulletins, including Flash Flood Watches, Advisories, and Warnings,

3

for New Braunfels and Comal County. (CR 410-21).[2]  Randy Schumann, a Camp Huaco Springs manager, was working in San Marcos until 3:30 AM at which point he drove home past Camp Huaco Springs to his house upstream. (CR 1802).  By the time Schumann drove home, ten weather bulletins had been issued and steady rain had already been falling for some time. (CR 409-21, 1802).  If he had been paying attention to the weather bulletins, he would have been aware of the flood risk and could have easily warned the visitors at the Camp Huaco Springs. However, Camp Huaco Springs did not have any personnel responsible for monitoring weather alerts and he did not stop to warn any of the persons sleeping at Camp Huaco Springs. (CR 409-21, 1800-02).  Schumann did not attempt to contact anyone about the danger of flooding until he received a phone call from his boss Eddie Gillespie at 6 AM on June 9, 2010. (CR 1801-1802).  By that time it was too late because the bridges between his home and the camp were already flooded and the Walkers and the Johnsons were already being swept down river. (CR 1378-81; App. Tab 4; CR 1802).  At the same time that Schumann received the phone call from his superior, Cynthia Walker was awakened by her dog barking and her brother screaming from the adjacent trailer. (CR 1378-79; App. Tab 4).  Within minutes, the water was coming into their trailer and they were all swept down river along with their trucks and trailers. (CR 1378-81; App. Tab 4).

---

[2] Several of these bulletins warned "do not stay in flood prone areas." (CR 416, 420).

5) Camp Huaco Springs is a business operated for profit that, among other activities, rents RV parking lots on a paved strip approximately 100 feet wide between River Road and the bank of the Guadalupe River. (CR 1799, 2233). The 76 paved house trailer rental lots are improved with water and waste water connections. (CR 1404, 1799, 2233). The lease for the property identifies Richard Rivers, William Rivers, and UME, Inc. as lessees. (CR 1398). The lease also provides that WWGAF, Inc. and Rockin' R River Rides are permitted to operate their business on the property. (CR 1406). The lease restricts the use of the property to leasing for human habitation for vacation purposes and the rental of watercraft and innertubes. (CR 1409).

6) Brothers Richard Rivers and William Rivers are the sole shareholders and officers of UME, Inc. which has an assumed name certificate on file for the name "Camp Huaco Springs." (CR 309, 479-80, 1769, 1805). UME Inc.'s summary judgment motion admits that it is the owner of the business at Camp Huaco Springs. (CR 309). The Rivers brothers are also the sole shareholders and corporate officers of WWGAF, Inc. ("WWGAF/Rockin' R") which has an assumed name certificate on file for the name Rockin' R River Rides. (CR 391, 485-86, 1769, 1805). At summary judgment, WWGAF/Rockin' R argued that it did not own, operate or manage the Camp Huaco Springs property because its business is restricted to river equipment rental. (CR 309, 1198, 1204-05, 1211).

5

7)     WWGAF/Rockin' R maintains a river equipment rental operation on the site of Camp Huaco Springs. (CR 1693, 1806).  WWGAF/Rockin' R's insurance policy identifies 4881 River Road, which is the address of Camp Huaco Springs, as a premises that WWGAF/Rockin' R owns, rents or occupies. (CR 1604, 1772). The WWGAF/Rocking' R policy also states that "campground" is one of its insured activities. (CR 1639).  WWGAF/Rockin' R is also listed as an additional insured under the UME, Inc. insurance policy for Camp Huaco Springs. (CR 1535).  Eddie Gillespie, the General Manager of Camp Huaco Springs, testified that Camp Huaco Springs is owned by Rockin R' and that Rockin R' is owned by the Rivers Brothers. (CR 1784).  Randy Schumann, a manager at Camp Huaco Springs, testified that Camp Huaco Springs is a division of Rockin' R. (CR 1804). The police report regarding Norman Walker's death identified WWGAF/Rockin' R as the location of the Walker's RV at the time of the flood. (CR 1734).  UME, Inc. and WWGAF/Rockin' R share corporate offices, personnel, and office equipment. (CR 1787).  UME, Inc. and WWGAF/Rockin' R also engage in combined marketing and advertisement through the Camp Huaco Springs' website and social media – the "About Us" page of the Camp Huaco Springs' website identifies WWGAF, Inc. as the entity in charge of Camp Huaco Springs and contains no mention of UME, Inc. (CR 1692-1701).  To the extent that any corporate meetings for either entity take place, they occur when one brother

6

wanders into the other brother's office without any corporate formalities or corporate records. (CR 1747, 1751).

8) Appellees' summary judgment arguments relied on the testimony of two Comal County Sheriff's personnel who testified that they drove through the Camp Huaco Springs premises during the night and warned people about the risk of potential flood through their car loudspeakers. (CR 394-99, 460-65, 1422-40). The summary judgment record includes an affidavit from Thomas Eaves, who was present at Camp Huaco Springs during the flood and disputed the testimony of the sheriff's personnel stating that he never heard nor saw any law enforcement personnel there. (CR 867-68). Cynthia Walker also did not hear or see any law enforcement announcement during the night because she slept through the night without waking until 6 AM. (CR 1378-79; App. Tab 4).

## SUMMARY OF ARGUMENT

1) Appellees knew of a dangerous condition and created a dangerous situation at Camp Huaco Springs that resulted in the death of Norman Walker and severe injuries to Cynthia Walker and Caren Johnson, therefore there is a question of fact for trial for all elements of a claim for landowner or occupant liability.

2) The Recreational Use Statute does not apply in this case because:

    a. The Camp Huaco Springs premises is not agricultural land.

    b. The statute does not apply to commercial for profit businesses.

    c. The Camp Huaco Springs premises is not land in its natural state removed from human habitation.

    d. The Walkers and the Johnsons were not engaged in a recreational use at the time of the flood.

    e. The Recreational Use Statute should be strictly construed against the derogation of Appellants' common law rights.

3) Alternatively, if the Recreational Use Statute applies, the evidence creates a question of fact for trial for a claim of gross negligence because Appellees acted with subjective awareness of an extreme degree of risk, indicating conscious indifference to the rights, safety, or welfare of the Walkers and the Johnsons.

4) Based on the terms of the lease and other summary judgment evidence, UME, Inc., WWGAF/Rockin' R, and the Rivers brothers are all occupants of the

8

Camp Huaco Springs premises therefore all of them are subject to landowner or occupant liability in this case.

5) Camp Huaco Springs is a joint enterprise between UME, Inc. and WWGAF/Rockin' R because there is an express or implied agreement for the common purpose with a community of pecuniary interest and an equal right to control the premises, therefore both entities are subject to liability.

6) The testimony of Comal County Sheriff personnel regarding warnings made during the night does not establish any basis for summary judgment because it is only relevant to the affirmative defense of comparative fault or contributory negligence.

# ARGUMENT

## I. Standard of Review

### A. The Court should reverse because there is more than a scintilla of evidence to support a question of fact for trial.

1) This is an appeal from a summary judgment, therefore the Court must consider all the evidence in the light most favorable to Appellants, crediting all evidence favorable to Appellants and disregarding contrary evidence. *Boerjan v. Rodriguez*, 436 S.W.3d 307, 311-12 (Tex. 2014). Appellees brought both traditional and no-evidence motions for summary judgment and the Court granted summary judgment without specifying the grounds. (CR 2172, 2194-2201; App. Tabs 1-2). The Court should reverse and remand for trial if there is more than a scintilla of evidence supporting each element of Appellants' claims. *Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 248 (Tex. 2013). The summary judgment record contains ample evidence to support each element of Appellants' claim, therefore the Court should reverse and remand for trial.

## II. Appellees' Duty

### A. Appellees[3] had a duty because they were aware of a dangerous condition that was unknown to Appellants.

---

[3] There is a dispute as to just who is responsible for the obligations of Camp Huaco Springs. Appellees contend that only UME, Inc. is responsible for Camp Huaco Springs and that the other Appellees have no liability for any act or omission at the premises. This dispute is the subject of a subsequent section of this brief. For this section, Appellants will use "Camp Huaco Springs" to refer generally to Appellees.

2)     When a landowner knows of a hidden and dangerous condition such that a reasonable user would not expect to encounter it on the property, the foreseeability and likelihood of the risk of harm can outweigh the burden of imposing a duty of care on the landowner. *City of Waco v. Kirwan*, 298 S.W.3d 618, 626 (Tex. 2009); *Suarez v. City of Texas City*, 465 S.W.3d 623, 633 (Tex. 2005).  The summary judgment evidence establishes that there was a dangerous condition at Camp Huaco Springs because it was susceptible to flash flooding. (CR 1746-49, 1771-72, 1785).     Richard and William Rivers, the owners of UME, Inc. and WWGAF/Rockin' R, both testified that they knew there had been previous floods in 1998 and 2002. (CR 1746-49, 1771-72).  Eddie Gillespie, the general manager of Camp Huaco Springs, testified that he knew that the 1998 and 2002 floods had been twice as bad as the 2010 flood. (CR 1785).  The Walkers and the Johnsons had never been to Camp Huaco Springs before. (CR 1375-76; App. Tab 4).  Camp Huaco Springs did not provide any safety information or post any warnings about the risk of flash floods on the premises. (CR 1783-84, 1798-99).  Accordingly, the Walkers and the Johnsons had no reason to expect that the premises were subject to flash floods.  The flash flooding at Camp Huaco Springs poses an extremely high risk of harm because it washes away trucks, RV house trailers, trees, and people, resulting in severe injuries and death with little or no warning. (CR 1378-81; App. Tab 4).  Because Appellees knew there was a risk of flash flooding

11

posing an extreme risk of injury and death to unsuspecting visitors like the Walkers and the Johnsons, the summary judgment evidence establishes a duty of care under *Kirwan,* 298 S.W.3d at 626 and *Suarez,* 465 S.W.3d at 633.

**B.** **Appellees had a duty to warn Appellants because they created a dangerous situation.**

3) "Texas law does recognize a duty to warn on the part of the person who creates a dangerous situation." *Chrysler Corp. v. Dallas Power & Light Co.*, 522 S.W.2d 742, 744 (Tex. App – Eastland 1975, n.r.e.) (Defendant created dangerous flood conditions and therefore had a duty to warn.) Camp Huaco Springs created a dangerous condition by directing the Walkers and the Johnsons to park and sleep in a location prone to life-threatening flash floods. The summary judgment evidence establishes that Camp Huaco Springs created paved and improved lots in a flash flood prone location. (CR 1376-77; App. Tab 4; CR 2226-33). The Walkers and the Johnsons did not choose the location where they parked and slept, because these locations were assigned to them by Camp Huaco Springs' personnel, who directed them to park there. (CR 1376; App. Tab 4). This created a dangerous situation because the location is prone to flash flooding with little or no notice such that sleeping individuals can be swept away by flood waters resulting in severe injuries and death. (CR 1378-81; App. Tab 4). Because Appellees created a dangerous situation, they had a duty to warn Appellants under *Chrysler Corp.*, 522 S.W.2d at 744.

12

**C.**     **Appellees had a duty to make Camp Huaco Springs safe because they controlled the conduct of its visitors.**

4)     A party that controls the visitors to a premises owes a duty to the visitors. *Wilson v. Texas Parks & Wildlife Dep't*, 8 S.W.3d 634, 635-36 (Tex. 1999). Camp Huaco Springs directed the Walkers and the Johnsons to park and sleep in specific paved and improved lots in a dangerous flash flood zone. (CR 1376-77; App. Tab 4; CR 2226-33). The situation might be different if Camp Huaco Springs merely charged admission to an open and unimproved tract of land and allowed visitors to select their sleeping locations at their own risk. Under those circumstances, Camp Huaco Springs might reasonably argue that it exercised no control over its visitors. But the operators of Camp Huaco Springs decided to create a paved and improved premises and control the sleeping locations of its visitors. Because Appellees exercised control over the Walkers and the Johnsons and directed them to park and sleep in a dangerous flash flood prone location, Appellees owed them a duty under *Wilson*, 8 S.W.3d at 635-36.

**D.**     **The co-owner of Camp Huaco Springs testified that he had a duty to make the Walkers' and the Johnsons' stay as safe has he can.**

5)     At his deposition, Richard Rivers testified:

Q.     "[D]o you agree [you] owe responsibilities to the campers that you have at the Camp Huaco Springs to make their stay – stay there as reasonable and safe as you can?

13

...

A. Yes.

This by itself establishes that Camp Huaco Springs owed the Walkers and the Johnsons a duty to make their stay safe. Accordingly, there is no dispute that Appellees owed a duty of care to the Walkers and the Johnsons when they stayed at Camp Huaco Springs.

## III. Appellees' Breach

### A. Camp Huaco Springs failed to take any action to make the premises safe for its visitors.

6) Richard Rivers, William Rivers, Eddie Gillespie, and Randy Schumann all testified that they were aware of the history of dangerous flooding at the Camp Huaco Springs premises. (CR 1746-49, 1771-72, 1785, 1798). These witnesses also uniformly testified that no actions of any kind were taken to improve the safety of the Camp Huaco Springs premises. (CR 1747, 1749, 1769, 1772, 1783, 1799). Following the 2002 flood, Camp Huaco Springs engaged in major improvements by installing sewer lines and improving the RV trailer house lots. (CR 1798-99). However, there was no effort to increase the grade of the RV trailer house parking to protect visitors against flood waters. (CR 1799). Furthermore, there was no attempt to install any flood water gauge, monitor, or warning device

14

to protect the visitors to Camp Huaco Springs. (CR 1800).[4] Other RV trailer house parks with tornado risks maintain a tornado warning siren, indicating that a reasonable park operator would install such equipment when there is a risk of dangerous weather. (CR 1382, 1389-90; App. Tab 4). Accordingly, the summary judgment evidence shows that Camp Huaco Springs took no actions to fulfill the duty to make the premises safe for visitors sleeping unaware in a flash flood prone location.

**B.** **Camp Huaco Springs failed to monitor weather warnings.**

7)      Starting at 10:30 AM the day before Norman Walker's death, the National Weather Service issued 13 flash flood bulletins for New Braunfels and Comal Counties. (CR 409-21). Camp Huaco Springs had no personnel responsible for monitoring such weather bulletins, therefore nobody at Camp Huaco Springs was aware of the multiple flash flood bulletins. (CR 1800). Because Camp Huaco Springs is in a flash flood prone location that has been subject to previous flash floods, the minimal effort required to monitor such bulletins and notify visitors would be a reasonable precaution.[5] Failure to monitor weather bulletins is another

---

[4] A flood monitor system was installed after the 2010 flood. (CR 1800).

[5] A number of websites and applications (such as https://alert.accuweather.com/accualert/index) provide location based weather service bulletin alerts that do not require active monitoring, but rather provide email or text notifications of weather bulletins for requested locations.

15

example of how Camp Huaco Springs failed to discharge its duty regarding the safety of its visitors.

### C. Camp Huaco Springs provided no flood safety information.

8) Camp Huaco Springs did not provide the Walkers or the Johnsons, or any other visitors, any information regarding the flood risk on the premises when they arrived. (CR 1376; App. Tab 4; CR 1798). Camp Huaco Springs did not post any warnings on the premises notifying visitors of the risk of flash flooding. (CR 1783-84, 1800). All other RV trailer home parks visited by the Walkers provided written instructions regarding weather or other hazards of the location, indicating that the standard of care includes this relatively minimal effort to provide visitors with warning. (CR 1389-90; App. Tab 4). Posting written notices and handing out safety information regarding flood risks is a relatively low burden given the extreme risk of harm posed by flash flooding, but Camp Huaco Springs made absolutely no effort to discharge its duty to provide a warning regarding the hazards of flash flooding on the premises.

### D. Camp Huaco Springs had no onsite personnel at night.

9) Camp Huaco Springs did not maintain 24-hour onsite personnel at the premises. (CR 1783, 1799). All other RV trailer home parks visited by the Walkers had 24-hour onsite personnel, and in the instance of a tornado warning, the onsite personnel came and knocked on their door to alert them. (CR 1382, 1389-90; App. Tab 4). If Camp Huaco Springs had maintained overnight personnel like other RV

16

trailer house parks, such personnel could have knocked on the door of the Walkers' and the Johnsons' house trailers and made sure that they were awake and aware of the flood risk. Because Camp Huaco Springs did not maintain such personnel, no such warning was provided, resulting in the death of Norman Walker and severe injuries to Cynthia Walker and Caren Johnson.

### E. The summary judgment evidence establishes that Camp Huaco Springs took no action to discharge its duties.

10) As established above, the summary judgment evidence establishes that Camp Huaco Springs had a duty to make the premises safe and to warn the Walkers and the Johnsons. The summary judgment evidence establishes that Camp Huaco Springs took no action of any kind to make the premises safe, to monitor applicable weather bulletins, to install any flood monitoring system, to provide any notices or warnings, or to provide onsite personnel. Other park operators install warning equipment, provide written notices of hazardous conditions, and provide 24-hour personnel who provide warnings of dangerous weather, indicating that such measures are within the realm of reasonable precautions. Because Camp Huaco Springs failed to do anything to fulfill its duty to provide a safe premises and warn visitors of the flood hazard, there is more than a scintilla of evidence from which the jury could conclude that Appellees breached their duty to the Walkers and the Johnsons.

17

## IV. Appellees' Breach Caused Damages

### A. Appellants suffered personal injury, wrongful death, and property damages as a result of the failure of Camp Huaco Springs to fulfill its duty to them.

11) Camp Huaco Springs failed to make its premises safe or warn the Walkers and the Johnsons of the flood hazard and Norman Walker died as a result. (CR 1380-84; App. Tab 4; CR 1733-35). Cynthia Walker and Norman's children, Stephen, Jordan and Stephanie, suffered wrongful death damages as a result. (CR 1464-67). Caren Johnson and Cynthia Walker were swept down the river in the flood suffering severe personal injuries and property loss. (CR 1380-87; App. Tab 4). Therefore, the summary judgment evidence establishes more than a scintilla of evidence of duty, breach, and damages suffered by the Appellants and the Court should reverse and remand for trial.

## V. CPRC Chapter 75 Does Not Apply

### A. The Recreational Use Statute does not apply because the premises is not agricultural land.

12) Appellees contend that Civil Practice & Remedies Code Chapter 75 applies to this lawsuit claiming that Camp Huaco Springs is agricultural land suitable for cattle grazing. The photographs of the location demonstrate that Camp Huaco Springs is a narrow strip of land between River Road and the Guadalupe River that is virtually all paved with concrete. (CR 2226-33; App. Tab 5). The testimony establishes that Camp Huaco Springs is a paved RV trailer house park improved

18

with water and wastewater plumbing for the RV parking spaces. (CR 1376; App. Tab 4; CR 1799). There is no pasture between the road and the river in this location. Furthermore, cattle grazing on this property is prohibited by Appellees' lease, which expressly limits the use of the property "for the rental of the existing cabins or additional structures placed thereon by Lessee <u>for the purposes of human habitation for vacation purposes only</u>, and for the rental of water craft of every description and innertubes. … The premises may not be used for any other business endeavors." (CR 1409) (emphasis added). Not only is the property not physically suitable for agricultural use, agricultural use is prohibited by the lease. Accordingly, the property is not agricultural land for the purposes of Civil Practice & Remedies Code Chapter 75.

**B.** **The insurance provisions of the Recreational Use Statute do not apply to commercial recreation businesses.**

13) Appellees argue that they are protected by Civil Practice & Remedies Code §75.003(c)(3) because they maintain liability insurance in accordance with §75.004(a). However, §75.004(a) is expressly limited to agricultural land: "[T]he liability of an owner, lessee, or occupant of <u>agricultural land</u> used for recreational purposes…" (emphasis added). As demonstrated above, Camp Huaco Springs is not agricultural land. Furthermore, the statute does not apply to commercial operations. "[T]he purpose of [§75.003(c)] was to <u>expressly prevent landowners who specialize in commercial recreation</u> from wrongfully taking advantage of the

19

statute." *McMillan v. Parker*, 910 S.W.2d 616, 619 (Tex. App. – Austin 1995, writ denied) (emphasis added); *Howard v. E. Tex. Baptist Univ.*, 122 S.W.3d 407, 411 (Tex. App. Eastland 2003, no pet.) It is undisputed that Appellees operate a commercial recreation business:

> Q: Okay. Now at all times when you were working at Camp Huaco Springs, did – was there a – was this this operated as a commercial business?

> A. As in opposed to a state facility or – I'm not understanding what you're –

> Q: Okay. No. I mean, the – the Camp Huaco Springs was a – was a business in – providing services in exchange for money for profit?

> A: Yes.

> (CR 1799)

It is undisputed that Appellees specialize in commercial recreation, therefore the Recreational Use Statute does not apply.

**C.** **The Texas Supreme Court recently clarified the application of the Recreational Use Statute.**

14) On March 20, 2015, after the first interlocutory summary judgment order and six days before the second interlocutory summary judgment order, the Supreme Court issued a decision under the Recreational Use Statute in *Univ. of Tex. at Arlington v. Williams*, 459 S.W.3d 48 (Tex. 2015). In that case, the plaintiff was at a high school soccer match at UT Arlington stadium and was

20

injured due to a fall caused by a faulty gate latch. The Court extensively analyzed the recreational use statute and held that it did not apply to insulate UT Arlington from liability. Justice Devine's plurality opinion concluded that the statute did not apply to spectating in a soccer stadium because it was not intended to apply to improved property, but rather to property made available in its natural state, as "part of the physical world that is removed from human habitation." *Id.* at 43-55. Justice Guzman, joined by Justice Willett, concurred and held that application of the statute "turns entirely on the precise activity the plaintiff was engaged in when the injury occurs." *Id.* at 58. Because the plaintiff was no longer watching the game, but instead was leaning against the gate waiting to sign a release document so she could take her daughter home, Justice Guzman concluded that the statute could not apply because that precise activity could not constitute recreational use. *Id.* Justice Boyd concurred, stating "[b]ecause the statute deprives invitees of their common law right to recover for injuries caused by a landowner's negligence, and instead permits them to recover only upon proof of gross negligence, malicious intent, or bad faith, see Tex. Civ. Prac. & Rem. Code § 75.002(d), we must strictly construe it and apply it only to cases that are "clearly within its purview." *Id.* at 62. Because the plaintiff's activity did not clearly fall within the application of the statute, the statute did not apply. *Id.* Camp Huaco Springs is improved for the purposes of human habitation. Sleeping in a house trailer is a residential, not

21

recreational, use. Because the statute must be strictly construed as a deprivation of common law rights, the Recreational Use Statute should not apply to this case.

**D. Camp Huaco Springs is not in its natural state nor is it removed from human habitation.**

15) The summary judgment evidence shows that Camp Huaco Springs is a fully paved premises with water and waste water connections for 76 residential house trailers (CR 1376; App. Tab 4; CR 1799, 2226-33; App. Tab 5). Clearly this property is not in its "natural state" nor is it "removed from human habitation" because the entire purpose of this property is for human habitation. The Defendants' lease even restricts the use of the property to commercial use for "human habitation for vacation purposes." (CR 1409). Because the Supreme Court has concluded in *Williams* that the statute only applies to property in its "natural state" "removed from human habitation," Camp Huaco Springs is not subject to the Recreational Use Statute.

**E. Sleeping in a house trailer is not a recreational use.**

16) At the motion for new trial, Appellees argued that *Williams* was inapplicable because the activity in that case was argued to fall within the "other activity associated with enjoying nature" provision of §75.001(3)(L) and that the Walkers and the Johnsons were engaged in "camping." The Johnson's vehicle was a 38-foot fifth wheel trailer with a master bedroom, bathroom, shower, kitchen, two televisions, and a satellite TV antenna. (CR 1375; App. Tab 4). This residential

22

structure, defined as a "House trailer" by Texas Transportation Code §501.002(9), is larger and more luxurious than many immobile residential premises, such as hotels, dormitories, and efficiency apartments. Many people use such house trailers as permanent residences, such as the occupants of the Pecan Grove RV Park at 1518 Barton Springs Road in Austin, where most of the lots are occupied by permanent residents. As discussed by Justice Guzman in *Williams*, the focus is on the precise activity Appellants were engaged in at the time of the injury. Furthermore, as discussed by Justice Boyd, the statute must be strictly construed as a derogation of common law rights of invitees. At the very least, this creates a question of fact for the jury as to whether or not the Walkers and the Johnsons were "camping" as contemplated by the statute and therefore subject to a heightened standard of care.

17) Furthermore, Appellees' argument goes too far because limiting *Williams* to the "other activity" provision of §75.001(3)(L) would mean that students in sleeping bags inside a school stadium are engaged in "camping" and subject to the recreational use statute regardless of the fact that the stadium is not land in its natural state removed from human habitation. The Recreational Use Statute does not apply to this case because the Camp Huaco Springs RV trailer house park is not agricultural land and it is not in its natural state removed from human habitation. However, even if Camp Huaco Springs is subject to the statute, the

Court should reverse and remand because sleeping in a house trailer is not a recreational use to which the statute applies.

## VI. Appellees' Gross Negligence

### A. Even if the Recreational Use Statute applies, there is sufficient evidence to establish gross negligence.

18) As discussed above, the Recreational Use Statute does not apply to this case because this is not agricultural land, the statute does not apply to commercial recreation businesses, this premises is not in its natural state and removed from human habitation, and sleeping in a house trailer is not a recreational use. However, should the Court conclude that the statute applies, there is more than sufficient evidence to create a question of fact for gross negligence. "Because gross negligence may result from acts or omissions, and section 75.002(d) does not distinguish between injuries caused by conditions and activities, we conclude that section 75.002(d) permits a premises defect claim for gross negligence." *State v. Schumake*, 199 S.W.3d 279, 287 (Tex. 2006). Gross negligence is "an act or omission involving subjective awareness of an extreme degree of risk, indicating conscious indifference to the rights, safety, or welfare of others." *Id.* "[A] landowner can be liable for gross negligence in creating a condition that a recreational user would not reasonably expect to encounter on the property in the course of the permitted use." *Id.* at 288. "If a landowner has knowledge of an uncommon, hidden peril or danger on the land that is not inherent in the use to

24

which the land is put and that would not be reasonably discovered or avoided by a trespasser, the landowner's failure to warn or guard against such a danger could amount to willful, wanton, or malicious inaction." *Id.*

19)   In *Schumake*, a child drowned in a culvert due to a dangerous undertow at a state park. The Texas Parks Department was aware of the undertow because others had been caught in it and reported it. *Id.* at 281. The Texas Supreme Court concluded that because the State, as operator of the premises, was aware of the hidden danger and did not warn the plaintiffs, there was sufficient evidence to establish a claim for gross negligence. *Id.* at 288. The evidence in this case is very similar. Appellees were aware that the location of this lot was subject to extreme flooding but nevertheless elected to construct RV trailer house rental lots in the flash flood zone. (CR 1785, 1798-1800). The Walkers and the Johnsons did not know they were in a flash flood prone area, because they had never been to this location before. (CR 1375-76; App. Tab 4). Therefore, the Appellees created a dangerous condition that included a hidden danger of flooding of which the Walkers and the Johnsons were unaware. The extreme danger of flooding while visitors sleep in this location is clear – the rising water can sweep them away resulting in injury and death, which is what happened to the Walkers and the Johnsons. Therefore, the Appellees were subjectively aware of an extreme degree of risk and were consciously indifferent to the safety of the Walkers and the

25

Johnsons in failing to make the premises safe or warn them of the danger. Under the holding of the Texas Supreme Court in *Schumake*, this is sufficient evidence for a trial on a claim of gross negligence. Therefore, even if the recreational use statute applies, the Court should deny summary judgment and proceed to trial on a claim of gross negligence.

## VII. Liability of the Rivers Brothers and WWGAF

### A. Under the terms of the lease, the Rivers brothers and WWGAF/Rockin' R are occupants of the Camp Huaco Springs premises.

20) UME, Inc. has an assumed name certificate on file for the name "Camp Huaco Springs" and admits in its summary judgment motion that it is the owner of Camp Huaco Springs. (CR 309, 479-80). The Rivers brothers and WWGAF/Rockin' R contend that they are not liable because only UME, Inc. is responsible for the Camp Huaco Springs premises. The terms of the lease for Camp Huaco Springs state that Richard and William Rivers are lessees who have "quiet enjoyment and possession of the premises." (CR 1398-99). Furthermore, the lease provides that WWGAF/Rockin' R is permitted to operate its business on the premises. (CR 1406). The right of control of a premises can be shown by the terms of a lease contract. *Shell Oil Co. v. Khan*, 138 S.W.3d 288, 292 (Tex. 2004). Accordingly, the terms of the lease itself provide more than a scintilla of evidence

from which the jury could conclude that William Rivers, Richard Rivers, and WWGAF/Rockin' R are also responsible for the Camp Huaco Springs premises.

**B.    WWGAF/Rockin' R engages in business operations on the Camp Huaco Springs premises.**

21)    Consistent with the terms of the lease, WWGAF/Rockin' R does operate a rental business on the Camp Huaco Springs premises. (CR 1693, 1806). Furthermore, WWGAF/Rockin' R admits that it "owns, rents or occupies" the Camp Huaco Springs premises in its insurance policy because one of its insured locations is 4881 River Road, which is the address of Camp Huaco Springs. (CR 1604, 1772).   The policy also admits that WWGAF/Rockin' R is one of the operators of Camp Huaco Springs because "campground" is one of its insured activities. (CR 1639).  Finally, WWGAF/Rockin' R is an additional insured under the UME, Inc. policy, which covers Camp Huaco Springs. (CR 1535).  A party that occupies or controls a premises is subject to premises liability. *County of Cameron v. Brown*, 80 S.W.3d 549, 554 (Tex. 2002).  Because WWGAF/Rockin' R engages in actual business operations on the Camp Huaco Springs premises, there is more than a scintilla of evidence from which the jury can conclude that WWGAF/Rockin' R occupies or controls the premises and is subject to liability for the death and injuries of the Walkers and the Johnsons.

**C.** **There is a question of fact as to a joint enterprise between UME, Inc. and WWGAF/Rockin' R.**

22) In addition to being liable as an occupant in control of the premises, WWGAF/Rockin' R can also be held vicariously liable based on its joint enterprise with UME, Inc. *Texas DOT v. Able*, 35 S.W.3d 608, 613 (Tex. 2000). The summary judgment evidence demonstrates there is an express or implied agreement for a common business purpose and an equal right to control the enterprise. *Id.* Both UME, Inc. and WWGAF/Rockin' R operate businesses on the Camp Huaco Springs premises. (CR 309, 1693, 1806). The managers of Camp Huaco Springs cannot even distinguish UME, Inc. from WWGAF/Rockin' R because Eddie Gillespie, the general manager who has worked for the Rivers brothers since 1992, testified that Camp Huaco Springs is owned by Rockin R' and Rockin R' is owned by the Rivers Brothers. (CR 1783-84). Randy Schumann, a Camp Huaco Springs manager, testified that Camp Huaco Springs is a division of Rockin' R. (CR 1804). UME, Inc. and WWGAF/Rockin' R are both owned by the Rivers brothers and share corporate offices, personnel, and office equipment. (CR 1787). Furthermore, the supposedly separate companies engage in combined marketing and advertisement through the Camp Huaco Springs' website and social media. (CR 1692-1701). The "About Us" page of the Camp Huaco Springs' website identifies WWGAF, Inc. as the entity that runs Camp Huaco Springs and contains no mention of UME, Inc. (CR 1692). Furthermore, the Camp Huaco

28

Springs' website says: "Our second largest river equipment rental unit is located right at the end of the campground" which admits that the river equipment rental and Camp Huaco Springs are a single business, not separate businesses. (CR 1693). To the extent that any corporate meetings take place, they occur when one brother wanders into the other brother's office without any corporate formalities or corporate records. (CR 1747, 1751). This evidence establishes that both entities are integrally involved in the operation and control of Camp Huaco Springs, which is more than a scintilla of evidence for a jury trial on joint enterprise liability for WWGAF/Rockin' R.

### D. The Walkers purchased a combined package from "Camp Huaco Springs" that including an RV park stay and river rafting.

23) When the Walkers obtained their vacation package through a silent auction, it was for two nights at the RV park and river rafting, but the package directed Cynthia Walker only to the website for Camp Huaco Springs. (CR 1375; App. Tab 4). The Rivers brothers claim that UME, Inc. operates the RV park, WWGAF/Rockin' R operates all river rental business, and they maintain complete separation between the two entities. (CR 1770). However, the package sold to Cynthia Walker demonstrates that there is no such separation because "Camp Huaco Springs" sold her a package that included two nights in the RV park and river rafting services, both by Camp Huaco Springs from the same premises. This shows that there is a joint enterprise for both entities to share business and the

29

Camp Huaco Springs premises for the mutual benefit of both UME, Inc. and WWGAF/Rockin' R, all for the ultimate benefit of the Rivers brothers. Accordingly, the summary judgment evidence includes more than a scintilla of evidence of a joint enterprise such that both UME, Inc. and WWGAF/Rockin' R may be held liable for the death and injuries to the Walkers and the Johnsons.

## VIII. Testimony of Comal County Sheriff Personnel

### A. The testimony of Deputy Cline and Sergeant Prescott do not provide grounds for summary judgment.

24) Appellees have submitted the depositions of Comal Sheriff Deputy Cline and Sergeant Prescott who testified that they drove through the premises during the night of the flood to warn the visitors. (CR 460-65, 1422-41). This testimony is disputed by the affidavit of Thomas Eaves, who states that he was present at Camp Huaco Springs that night and never saw or heard any law enforcement personnel make any announcement or warning. (CR 867-68). Accordingly, to the extent that the actions of Prescott and Cline are relevant, there is a question of fact for jury trial with regard to whether or not Prescott and Cline did drive through the premises. However, even if it was undisputed that they drove through as they testified, such evidence would not be grounds for summary judgment. Prescott and Cline are not employees of Appellees and their actions do not constitute actions in discharge of the duties of Appellees. Appellees have not articulated why the actions of Prescott and Cline would be relevant in this case, however the only

30

possible relevance would be to argue that the negligence or gross negligence of Appellees was not the cause in fact of the Walkers' and the Johnsons' injuries. Assuming that Appellees articulate the only possible relevance of this evidence, the argument would have to be that Appellees' negligence did not cause the Walkers and Johnsons to be swept away by the flood because they failed to respond to the disputed warning claimed by Prescott and Cline. While this might be admissible to support a claim of comparative fault and contributory negligence, at most this is some evidence for jury consideration of an affirmative defense and cannot provide the basis for Appellees to prove as a matter of law that they were not grossly negligent or that their negligence did not cause the death and injuries suffered by the Walkers and the Johnsons.

## CONCLUSION

25) The summary judgment record contains more than a scintilla of evidence that Appellees owed a duty to the Walkers and the Johnsons because they knew that they were directing the Walkers and the Johnsons to park and sleep in a flash flood prone location of which the Walkers and the Johnsons were unaware. The summary judgment record demonstrates that Appellees did absolutely nothing to warn the Walkers and the Johnsons and did nothing to make the premises safe from the known danger of flash flooding, therefore there is a question of fact for trial on Appellees' failure to fulfill their duty to the Walkers and the Johnsons. It is

31

undisputed that the Walkers and the Johnsons suffered severe injuries, death, and property loss as a result. Because the premises is paved and improved, it is not agricultural land nor is it in its natural state, therefore the Recreational Use Statute does not apply. However, even if it did, the summary judgment record demonstrates that Appellees knew that the premises had an extremely dangerous risk of flash flooding and took no action to warn or protect the Walkers and the Johnsons from this known, and extremely hazardous, situation. Therefore, there is more than a scintilla of evidence from which the jury could conclude that Appellees are liable for gross negligence. Finally, there is more than a scintilla of evidence from which the jury could conclude that Richard Rivers, William Rivers, and WWGAF/Rockin' R controlled and occupied the premises, and alternatively that UME, Inc. and WWGAF/Rockin' R were engaged in a joint enterprise, therefore all of the Appellees can be held liable for the injuries and death suffered by the Walkers and the Johnsons. Because the summary judgment record establishes a question of fact for each of Appellants' claims against all of the Appellees, the Court should reverse and remand for trial.

## **PRAYER**

Appellants request that the Court reverse the trial court's grant of summary judgment as to all Appellants and remand this case for trial.

Respectfully submitted,

_____
Clark Richards
State Bar No. 90001613
crichards@rrsfirm.com
Richards Rodriguez & Skeith, LLP
816 Congress Ave., Suite 1200
Austin, Texas 78701
Fax (512) 476-0005
Tel (512) 476-1513
**ATTORNEY FOR APPELLANTS
CYNTHIA WALKER, Individually and
on Behalf of the ESTATE OF NORMAN
WALKER; STEPHEN WALKER;
STEPHANIE WALKER HATTON;
JORDAN WALKER; and CARRIE ANN
JOHNSON**

33

## CERTIFICATE OF COMPLIANCE

In compliance with Tex. R. Civ. App. P 9.4(i)(2)(B) and 9.4(i)(3), I certify that the number of words in this document, excluding those matters listed in Rule 9.4(i)(1), which was prepared in Microsoft Word using 14-point Times Roman, is 7,594 words.

_____

**CLARK RICHARDS**

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 28th day of October 2015, a copy of Appellants' Brief was served by email and first class mail on the following counsel:

Karen L. Landinger
klandinger@cbylaw.com
Andres R. Gonzalez
agonzalez@cbylaw.com
Cokinos Bosien & Young
10999 West IH-10, Suite 800
San Antonio, Texas 78230
*Attorneys for Appellee*
*WWGAF, Inc. d/b/a Rockin 'R' River Rides*

Willie Ben Daw, III
wbdaw@dawray.com
C. Thomas Valentine
tvalentine@dawray.com
Kyle D. Giacco
Kgiacco@dawray.com
5718 Westheimer, Suite 1750
Houston, Texas 77057
*Attorneys for UME, Inc. d/b/a Camp Huaco Springs, Williams George Rivers and Richard Duane Rivers*

_____
**CLARK RICHARDS**

## **APPENDIX**

TAB 1      Order Granting Defendant WWGAF, Inc.'s Amended Traditional and No Evidence Motion for Partial Summary Judgment, dated March 10, 2015.  (CR 2172)

TAB 2      Orders Granting Defendants, UME, Inc. d/b/a Camp Huaco Springs, William George Rivers, and Richard Duane Rivers' First Amended Traditional and No-Evidence Motion for Summary Judgment and No-Evidence Motion for Partial Summary Judgment, dated March 26, 2015. (CR 2194-2201)

TAB 3      Order granting in part Motion for Leave to Supplement Summary Judgment Record, dated April 21, 2015 (CR 2263)

TAB 4      Deposition of Cynthia Walker (CR 1371-1395)

TAB 5      Color copies of Plaintiffs' Supplemental Summary Judgment Exhibit R (also referenced as CR 2226-2233)

TAB 6      Tex. Civ. Prac. & Rem. Code Chapter 75, Recreational Use Statute

# TAB 1

CAUSE NO. C2012-0796D

FILED FOR RECORD
At 1:30 o'clock P M
MAR 10 2015
HEATHER N. KELLAR
CLERK DISTRICT COURT
COMAL COUNTY, TEXAS
BY_____ DEPUTY

| | |
|---|---|
| CYNTHIA WALKER, INDIVIDUALLY and ON BEHALF OF THE ESTATE OF NORMAN WALKER, STEPHEN WALKER, STEPHANIE WALKER HATTON, JORDAN WALKER, CAREN ANN JOHNSON AND TERRY JOHNSON § § § § § § § § | IN THE DISTRICT COURT OF |
| v. § § | COMAL COUNTY, TEXAS |
| UME, INC. d/b/a CAMP HUACO SPRINGS, WWGAF, INC. d/b/a ROCKIN 'R' RIVER RIDES, WILLIAM GEORGE RIVERS and RICHARD DUANE RIVERS § § § § § | 433RD JUDICIAL DISTRICT |

## ORDER GRANTING DEFENDANT WWGAF, INC.'S AMENDED TRADITIONAL AND NO-EVIDENCE MOTION FOR PARTIAL SUMMARY JUDGMENT

On this 10 day of March, 2015, came on to be heard Defendant WWGAF, Inc.'s Amended Traditional and No-Evidence Motion for Partial Summary Judgment. The Court, after having considered the Motion, the response and the arguments of counsel, is of the opinion that the Motion is well taken and should be granted.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that Defendant WWGAF, Inc.'s Amended Traditional and No-Evidence Motion for Partial Summary Judgment is hereby GRANTED, and all causes of action against Defendant WWGAF, Inc. d/b/a Rockin 'R' River Rides are hereby DISMISSED in its entirety.

SIGNED and ENTERED this 10 day of March, 2015.

_____
PRESIDING JUDGE

2172

3

# TAB 2

NO. C2012-0796D

FILED FOR RECORD
At 10:25 o'clock A M

MAR 2 7 2015

HEATHER N. KELLAR
CLERK DISTRICT COURT
COMAL COUNTY, TEXAS
BY_____DEPUTY

CYNTHIA WALKER, INDIVIDUALLY AND §
ON BEHALF OF THE ESTATE OF §
NORMAN WALKER, STEPHEN WALKER, §
STEPHANIE WALKER HATTON, §
JORDAN WALKER, CAREN ANN JOHNSON, §
and TERRY JOHNSON §
§
VS. §
§
§
UME, INC. D/B/A CAMP HUACO §
SPRINGS, WWGAF, INC. D/B/A §
ROCKIN 'R' RIVER RIDES, WILLIAM §
GEORGE RIVERS AND RICHARD DUANE §
RIVERS §

IN THE DISTRICT COURT OF

COMAL COUNTY, T E X A S

433RD JUDICIAL DISTRICT

## ORDER GRANTING DEFENDANTS, UME, INC. D/B/A CAMP HUACO SPRINGS, WILLIAM GEORGE RIVERS, AND RICHARD DUANE RIVERS' NO-EVIDENCE MOTION FOR SUMMARY JUDGMENT

On this day, the Court considered and/or heard Defendants, UME, Inc. d/b.a Camp Huaco Springs, William George Rivers, and Richard Duane Rivers' No-Evidence Motion for Summary Judgment. The Court, having considered the Motion, responses thereto, if any, arguments of counsel, if any, and documents on file in this case, is of the opinion that the Motion be, and is hereby, GRANTED.

It is hereby ORDERED, ADJUDGED and DECREED that Plaintiffs' claims for **BAD FAITH** asserted against Defendants, UME, Inc. d/b.a Camp Huaco Springs, William George Rivers, and Richard Duane Rivers are dismissed with prejudice.

It is hereby ORDERED, ADJUDGED and DECREED that Plaintiffs' claims for **VIOLATIONS OF THE DECEPTIVE TRADE PRACTICES ACT** asserted against Defendants, UME, Inc. d/b.a Camp Huaco Springs, William George Rivers, and Richard Duane Rivers are dismissed with prejudice.

2194

3

All relief not expressly granted herein is expressly DENIED.

SIGNED this ___26___ day of ___MAR___, 2015.

_____
JUDGE PRESIDING

**APPROVED AS TO FORM AND
ENTRY REQUESTED:**

**DAW & RAY, LLP**

By: ___/s/ Chelsea M. Plaisance___
    Willie Ben Daw, III
    State Bar No. 05594050
    C. Thomas Valentine
    State Bar No. 00786303
    Chelsea M. Plaisance
    State Bar No. 24074902
    5718 Westheimer Road, Suite 1750
    Houston, Texas 77057
    Telephone No. (713) 266-3121
    Facsimile No. (713) 266-3188
    WBDAW@dawray.com
    TVALENTINE@dawray.com
    CPLAISANCE@dawray.com

**ATTORNEYS FOR DEFENDANTS,
UME, INC. D/B/A CAMP HUACO SPRINGS,
WILLIAM GEORGE RIVERS AND RICHARD DUANE RIVERS**

NO. C2012-0796D

FILED FOR RECORD
At 10:25 o'clock AM

MAR 2 7 2015

HEATHER N. KELLAR
IN THE DISTRICT COURT COURT
COMAL COUNTY, TEXAS
BY _____ SMC _____ DEPUTY

CYNTHIA WALKER, INDIVIDUALLY AND §
ON BEHALF OF THE ESTATE OF §
NORMAN WALKER, STEPHEN WALKER, §
STEPHANIE WALKER HATTON, §
JORDAN WALKER, CAREN ANN JOHNSON, §
and TERRY JOHNSON §
§
§
VS. §
§                          COMAL COUNTY, T E X A S
§
UME, INC. D/B/A CAMP HUACO §
SPRINGS, WWGAF, INC. D/B/A §
ROCKIN 'R' RIVER RIDES, WILLIAM §
GEORGE RIVERS AND RICHARD DUANE §
RIVERS §                    433RD JUDICIAL DISTRICT

### ORDER GRANTING DEFENDANTS, UME, INC. D/B/A CAMP HUACO SPRINGS, WILLIAM GEORGE RIVERS, AND RICHARD DUANE RIVERS' FIRST AMENDED TRADITIONAL AND NO-EVIDENCE MOTION FOR SUMMARY JUDGMENT

On this day, the Court considered and/or heard Defendants, UME, Inc. d/b.a Camp Huaco Springs, William George Rivers, and Richard Duane Rivers' First Amended Traditional and No-Evidence Motion for Summary Judgment. The Court, having considered the Motion, responses thereto, if any, arguments of counsel, if any, and documents on file in this case, is of the opinion that the Motion be, and is hereby, GRANTED.

It is hereby ORDERED, ADJUDGED and DECREED that Plaintiffs' claims for NEGLIGENCE asserted against Defendants, UME, Inc. d/b.a Camp Huaco Springs, William George Rivers, and Richard Duane Rivers are dismissed with prejudice.

It is hereby ORDERED, ADJUDGED and DECREED that Plaintiffs' claims for PREMISES LIABILITY asserted against Defendants, UME, Inc. d/b.a Camp Huaco Springs, William George Rivers, and Richard Duane Rivers are dismissed with prejudice.

It is hereby ORDERED, ADJUDGED and DECREED that Plaintiffs' claims for GROSS NEGLIGENCE AND INTENTIONAL ACTS AND/OR OMISSIONS asserted against

2196

5

Defendants, UME, Inc. d/b.a Camp Huaco Springs, William George Rivers, and Richard Duane Rivers are dismissed with prejudice.

All relief not expressly granted herein is expressly DENIED.

SIGNED this _____ day of _____, 2015.

_____
JUDGE PRESIDING

APPROVED AS TO FORM AND
ENTRY REQUESTED:

DAW & RAY, LLP

By: _____
Willie Ben Daw, III
State Bar No. 05594050
C. Thomas Valentine
State Bar No. 00786303
Chelsea M. Plaisance
State Bar No. 24074902
5718 Westheimer Road, Suite 1750
Houston, Texas 77057
Telephone No. (713) 266-3121
Facsimile No. (713) 266-3188
WBDAW@dawray.com
TVALENTINE@dawray.com
CPLAISANCE@dawray.com

ATTORNEYS FOR DEFENDANTS,
UME, INC. D/B/A CAMP HUACO SPRINGS,
WILLIAM GEORGE RIVERS AND RICHARD DUANE RIVERS

and

2197

**NAMAN HOWELL SMITH & LEE, PLLC**

By: _Mark Cooper blp_

Mark A. Cooper
State Bar No. 24025752
Union Square II
10001 Reunion Place, Suite 600
San Antonio, Texas 78216
Telephone No. (210) 731-6350
Facsimile No. (210) 785-2950
Mcooper@namanhowell.com

**ATTORNEYS FOR DEFENDANTS,
WILLIAM GEORGE RIVERS AND RICHARD DUANE RIVERS**

NO. C2012-0796D

FILED FOR RECORD
AT 10:1X o'clock A

MAR 2 7 2015

CLERK DISTRICT
COMAL
BY SWC DEPUTY

| | | |
|---|---|---|
| CYNTHIA WALKER, INDIVIDUALLY AND | § | IN THE DISTRICT COURT OF |
| ON BEHALF OF THE ESTATE OF | § | |
| NORMAN WALKER, STEPHEN WALKER, | § | |
| STEPHANIE WALKER HATTON, | § | |
| JORDAN WALKER, CAREN ANN JOHNSON, | § | |
| and TERRY JOHNSON | § | |
| | § | |
| VS. | § | COMAL COUNTY, T E X A S |
| | § | |
| | § | |
| UME, INC. D/B/A CAMP HUACO | § | |
| SPRINGS, WWGAF, INC. D/B/A | § | |
| ROCKIN 'R' RIVER RIDES, WILLIAM | § | |
| GEORGE RIVERS AND RICHARD DUANE | § | |
| RIVERS | § | 433RD JUDICIAL DISTRICT |

## ORDER GRANTING DEFENDANTS, UME, INC. D/B/A CAMP HUACO SPRINGS, WILLIAM GEORGE RIVERS, AND RICHARD DUANE RIVERS' NO-EVIDENCE MOTION FOR PARTIAL SUMMARY JUDGMENT

On this day, the Court considered and/or heard Defendants, UME, Inc. d/b.a Camp Huaco Springs, William George Rivers, and Richard Duane Rivers' No-Evidence Motion for Partial Summary Judgment. The Court, having considered the Motion, responses thereto, if any, arguments of counsel, if any, and documents on file in this case, is of the opinion that the Motion be, and is hereby, GRANTED.

It is hereby ORDERED, ADJUDGED and DECREED that Plaintiffs' claims for **ALTER EGO** asserted against Defendants, UME, Inc. d/b.a Camp Huaco Springs, William George Rivers, and Richard Duane Rivers are dismissed with prejudice.

It is hereby ORDERED, ADJUDGED and DECREED that Plaintiffs' claims for **JOINT ENTERPRISE** asserted against Defendants, UME, Inc. d/b.a Camp Huaco Springs, William George Rivers, and Richard Duane Rivers are dismissed with prejudice.

All relief not expressly granted herein is expressly DENIED.

2199

SIGNED this ___26___ day of ___MAR___, 2015.

_____
JUDGE PRESIDING

APPROVED AS TO FORM AND
ENTRY REQUESTED:

DAW & RAY, LLP

By _____
Willie Ben Daw, III
State Bar No. 05594050
C. Thomas Valentine
State Bar No. 00786303
Chelsea M. Plaisance
State Bar No. 24074902
5718 Westheimer Road, Suite 1750
Houston, Texas 77057
Telephone No. (713) 266-3121
Facsimile No. (713) 266-3188
WBDAW@dawray.com
TVALENTINE@dawray.com
CPLAISANCE@dawray.com

ATTORNEYS FOR DEFENDANTS,
UME, INC. D/B/A CAMP HUACO SPRINGS,
WILLIAM GEORGE RIVERS AND RICHARD DUANE RIVERS

and

NAMAN HOWELL SMITH & LEE, PLLC


By: ~~Mark Cooper b/p~~
    Mark A. Cooper
    State Bar No. 24025752
    Union Square II
    10001 Reunion Place, Suite 600
    San Antonio, Texas 78216
    Telephone No. (210) 731-6350
    Facsimile No. (210) 785-2950
    Mcooper@namanhowell.com

**ATTORNEYS FOR DEFENDANTS,**
**WILLIAM GEORGE RIVERS AND RICHARD DUANE RIVERS**

# TAB 3

CAUSE NO. C2012-0796D

CYNTHIA WALKER, INDIVIDUALLY          §    IN THE DISTRICT COURT OF
AND ON BEHALF OF THE ESTATE OF        §
NORMAN WALKER, STEPHEN WALKER,        §
STEPHANIE WALKER HATTON,              §
JORDAN WALKER, AND                    §
CAREN ANN JOHNSON                     §
          Plaintiffs                  §
                                      §
VS.                                   §
                                      §    COMAL COUNTY, TEXAS
                                      §
UME, INC. D/B/A CAMP HUACO SPRINGS,   §
WWGAF, INC., D/B/A ROCKIN 'R' RIDES,  §
WILLIAM GEORGE RIVERS, AND RICHARD    §
DUANE RIVERS                          §
          Defendants                  §
                                      §    433RD JUDICIAL DISTRICT

FILED FOR RECORD
At 10:33 o'clock A M

APR 2 1 2015

~~COMAL COUNTY, TEXAS~~ . KELLAR
CLERK DISTRICT COURT
COMAL COUNTY, TEXAS
BY_____ DEPUTY

## ORDER

Came on for consideration the Plaintiffs' Motion for Leave to Supplement Summary Judgment Record in connection with the above-entitled and numbered cause. Having considered the motion, the response, and the arguments of counsel, the motion is GRANTED. It is therefore

ORDERED, ADJUDGED and DECREED that the Plaintiffs' Motion for Leave to Supplement Summary Judgment Record is Granted. *IN PART AS REFLECTED HEREIN.*

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the following exhibits are included in the summary judgment record:

*DW* ~~Exhibit R – Aerial and street view photographs of the site rental business.~~

*DW*
Exhibit R - Exhibits to Cynthia Walker's deposition showing the location of concrete paved assigned lots.

*DW* ~~Exhibit T - The York Creek RV Park rate sheet.~~

Signed this 21 day of April 2015.

_____
JUDGE PRESIDING

2263

# TAB 4

**Page 1**

CAUSE NO. C2012-0796D

CYNTHIA WALKER, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF NORMAN WALKER, STEPHEN WALKER, STEPHANIE WALKER HATTON, JORDAN WALKER, CAREN ANN JOHNSON AND TERRY JOHNSON ) IN THE DISTRICT COURT

v. ) COMAL COUNTY, TEXAS

UME, INC., D/B/A CAMP HUACO SPRINGS, WWGAF, INC., D/B/A ROCKIN 'R' RIVER RIDES, WILLIAM GEORGE RIVERS AND RICHARD DUANE RIVERS ) 433RD JUDICIAL DISTRICT

*****************************************
ORAL AND VIDEOTAPED DEPOSITION OF
CYNTHIA WALKER
DECEMBER 13, 2012
*****************************************

ORAL AND VIDEOTAPED DEPOSITION OF CYNTHIA WALKER, produced as a witness at the instance of the DEFENDANTS and duly sworn, was taken in the above-styled and numbered cause on the 13th day of December, 2012, from 11:50 a.m. to 3:49 p.m. before TEENA L. HARMON-DAVIS, a Certified Shorthand Reporter in and for the State of Texas, reported by machine shorthand at the offices of Mueller Law, 404 West 7th Street, Austin, Texas, pursuant to the Texas Rules of Civil Procedure and/or the provisions stated on the record or attached hereto.

**Page 3**

INDEX

Page

Appearances ..................................... 2

CYNTHIA WALKER

Examination by Mr. Sears ................... 4

Examination by Mr. Valentine ............. 68

Signature and Changes ......................... 95

Reporter's Certificate ........................ 97

EXHIBITS

No. Description                          Page

1 Photograph
........................................... 23

2 Photograph
........................................... 24

3 Medication Reconciliation List
........................................... 58

4 The Hartford Explanation of Benefits
........................................... 60

5 Inventory List
........................................... 63

6 Diagram of Campsite
........................................... 80

**Page 2**

APPEARANCES

FOR THE PLAINTIFFS:
Mr. Mark R. Mueller
MUELLER LAW
404 West 7th Street
Austin, Texas 78701
mark@voodoocowboy.com

FOR DEFENDANT ROCKIN 'R' RIVER RIDES:

Mr. John T. Sears
HENSLEE SCHWARTZ, LLP
2700 Via Fortuna, Suite 100
Austin, Texas 78746
jsears@hensleeschwartz.com

FOR DEFENDANT CAMP HUACO SPRINGS:
Mr. C. Thomas Valentine
DAW & RAY, LLP
5718 Westheimer Road, Suite 1750
Houston, Texas 77057
tvalentine@dawray.com

ALSO PRESENT:

Mr. Stephen Walker

Ms. Teena L. Harmon-Davis, Court Reporter

Mr. Brent Kirby, Videographer

**Page 4**

THE VIDEOGRAPHER: This is the videotaped oral deposition of Cynthia Walker. Today's date is December 13, 2012; the approximate time is 11:50 a.m. We're recording and on the record.

CYNTHIA WALKER, having been first duly sworn, testified as follows:

EXAMINATION

BY MR. SEARS:

Q. Would you tell me your name, please?

A. Cynthia Lynn Walker.

Q. Mrs. Walker, you've been present this morning when we took Stephen Walker's deposition, correct?

A. Yes.

Q. And you have some idea of what we're doing here?

A. Yes.

Q. My name's John Sears. I'm a lawyer. I represent Rockin 'R' River Rides. They're one of the defendants you've sued for damages resulting from the death of your husband, Norman Walker. Do you understand who I am and who I represent?

A. Yes.

Q. I'm going to ask you some questions about what happened the night your husband was drowned and about the damages you're claiming. And do you understand that

EXHIBIT "B"

1371

you're under oath?

A. Yes.

Q. The reporter is taking down my questions and your answers. She will reduce them to writing. You'll be given a chance to read and make any corrections you feel appropriate, and once you do that your testimony given today can be read to the jury when the case is tried and it will be just like you were giving it from the witness stand. Do you understand that?

A. Yes.

Q. Because of that it's very important that you understand my questions. And if you don't understand a question will you tell me?

A. Yes.

Q. If you'll keep doing what you're doing, saying yes and no as opposed to nodding your head or saying uh-huh or huh-uh, we'll all appreciate that. And if you'll let me finish my questions before you begin an answer, I will try to let you finish your answer before I ask another question, okay?

A. Yes.

Q. If you want to take a break or talk to your lawyer or take a break for any reason, please tell me and we'll do so. We're not on any schedule. This is not an endurance contest. The only thing I ask is, if I've asked a question and you decide you want a break, please answer that question before we take a break, okay?

A. Yes.

Q. Okay. What have you reviewed to prepare for this deposition?

A. Just the interrogatories that I was sent, the questions.

Q. You reviewed the questions and answers?

A. Yes, sir.

Q. Did you watch the settlement video that your lawyer sent us?

A. I haven't seen it, no, sir.

Q. Okay. Okay. Do you recall making a video or sitting before a video camera and talking about what happened in -- I assume in your lawyer's office?

A. Yes, sir.

Q. Who was present when that video was made?

A. The two attorneys that made the video with Mr. Mueller's office.

Q. Any of your children present?

A. No, sir.

Q. Okay. What's your date of birth?

A. July 19, 1953.

Q. 19 --

A. -- 53.

Q. Where were you born?

A. Shamrock, Texas.

Q. Up in the Panhandle?

A. Yes, sir.

Q. Tell me your education since high school.

A. I'm a graduate of Iowa Park High School and Midwestern State University. I have a Bachelor of Science degree in criminal justice.

Q. When did you graduate from high school?

A. 1971.

Q. And what year did you graduate from Midwestern State?

A. 1983.

Q. When did you go to work for the Wichita Falls Police Department?

A. I went to work for them June 6, 1983, one week after I graduated from college.

Q. What did you do in the 12 years between graduating from high school and graduating from college? Where were you employed?

A. I worked four years for Sprague Electric in Wichita Falls and four years for PPG Industries.

Q. What did you do for PPG?

A. I drove a pack truck -- drive a pack truck that -- I drove a pack truck doing -- transporting sheets of glass.

Q. Okay.

A. And in three years I went to college, after my son was born, and then I went to work for the police department.

Q. And you were married during part of this time, this 12-year period we're talking about?

A. Yes.

Q. What was your husband's name?

A. Dale Russell.

Q. I'm sorry?

A. Dale Russell.

Q. When did you and Mr. Russell marry?

A. We married May 26, 1975.

Q. How many children did you and Mr. Russell have?

A. Mr. Russell was my second husband.

Q. Okay. Let me, if I may, stop you and back you up. Who was your first husband?

A. My first husband was Jim Davis, James Lee Davis.

Q. When did you marry Mr. Davis?

A. May 27, 1972.

Q. Did you and Mr. Davis have children?

A. Yes, Jody Lynn.

Q. Is that the only child?

1372

**Page 9**

A. Yes.

Q. Did Mr. Davis pass away?

A. Yes.

Q. Okay. When did he pass away?

A. June 6, 1975.

Q. When did you marry Mr. Russell?

A. May 27, 1976.

Q. Okay. And you and Mr. Russell had one child?

A. Yes.

Q. And who is that child?

A. Cody.

Q. How old is Jody Lynn?

A. Jody was born November 22, 1973, and she's 39.

Q. How old is Cody?

A. Cody's 33.

Q. Okay. Where does Jody Lynn live?

A. She lives in Iowa Park.

Q. Okay. Is she married?

A. Yes, she's married, has three kids.

Q. Okay. Where does Cody live?

A. He lives in Irving.

Q. And is he married?

A. Yes, he's married.

Q. Does he have children?

A. No.

**Page 10**

Q. Okay. Did you and Mr. Russell subsequently divorce?

A. Yes. We were married eight years.

Q. Divorced in '84?

A. Yes.

Q. And when did you marry Mr. Walker?

A. March 30, 1990.

Q. Did you and Mr. Walker ever separate or file for divorce?

A. Never.

Q. And you and Mr. Walker had no children?

A. No.

Q. And I assume -- correct me if I'm wrong -- you met Mr. Walker at the police department.

A. Yes, sir.

Q. Okay. When did you retire from the Wichita Falls Police Department?

A. July 31, 2008.

Q. What was your final rank?

A. Sergeant.

Q. And you worked there 25 years?

A. Yes, sir.

Q. Okay.

A. One month, two weeks.

Q. How many days?

**Page 11**

A. I'll have to figure it.

Q. When you retired what was your job?

A. I was sergeant over community affairs and I did grants and public information.

Q. And how long had you held that position?

A. About three years.

Q. Did you start as a patrol person?

A. Yes, sir.

Q. How long were you on patrol?

A. Thirteen years.

Q. Then what did you do?

A. I went to detectives.

Q. Okay. And Mr. Walker was a detective, as I recall.

A. Yes, sir.

Q. Okay. How long were you a detective?

A. I was a detective sergeant when I went to detectives, and I was in there six years.

Q. Okay. Since you retired have you worked anywhere else?

A. No, sir.

Q. Okay. And was your only source of income after retirement your pension from the police department?

A. I'm also on disability and Social Security.

Q. Okay. And is that because of your multiple

**Page 12**

sclerosis?

A. Yes, sir.

Q. When was the MS first diagnosed?

A. December 2005.

Q. Okay. Who is the physician who primarily treats the multiple sclerosis?

A. Dr. Steven Farmer.

Q. Okay. Spell his last name, please.

A. F-A-R-M-E-R.

Q. Is he there in Wichita Falls?

A. Yes, sir.

Q. Is he with a group or by himself?

A. He's by himself. He's a neurologist.

Q. When did Norman Walker retire from the Wichita Falls Police Department?

A. December 31, 1998.

Q. And after his retirement did he have any outside employment except the security guard job at an auto show his son told us about?

A. No, sir.

Q. So his source of income was, 99 and a half percent at least, his retirement from the Wichita Falls Police Department?

A. His -- his -- all his income was from his retirement. He -- he only worked the car show two days

1373

## 13

one weekend a year. That was just for his deer lease because he didn't want it coming out of our household account.

Q. Sure. With regard to your financial affairs and the household accounts, were you the bookkeeper or was he?

A. I was.

Q. Okay. And you were the person who paid the bills, saw that the lights stayed on, all that sort of stuff?

A. Yes, sir.

Q. Mr. Walker contributed money to the accounts, but he relied on you to see that the people that were supposed to be paid got paid, correct?

A. Yes, sir.

Q. What rank did Mr. Walker have at the time he retired?

A. Detective.

Q. Am I correct that you outranked him?

A. Yes, sir.

Q. Okay. And your pension, I assume, was greater than his.

A. Yes, sir.

Q. Okay. How much was his pension?

A. Are you talking about monthly or yearly?

## 14

Q. Either one.

A. It was around 45,000 a year.

Q. Okay. And he was a police officer for 30 years?

A. Thirty-two.

Q. Thirty-two. Okay. And he was a homicide detective?

A. Yes, sir.

Q. Was he receiving any Social Security or had he qualified for it?

A. Yes, sir, he was receiving it.

Q. And how much was he receiving in Social Security?

A. About $1,200 a month.

Q. Okay. Are you receiving any Social Security benefits as a result of his death?

A. No, sir.

Q. Any widow's benefits?

A. No, sir.

Q. Do you qualify for them?

A. No, because my benefits are more than his.

Q. Do you receive any Social Security benefits as a result of work you performed?

A. (No response)

Q. Are you eligible to draw Social Security

## 15

retirement benefits?

A. I get Social Security Disability.

Q. Okay. All right. All right. What was Mr. Walker's health like in the three-year period before his death?

A. He was in excellent health.

Q. Did he have a family doctor?

A. Yes, sir.

Q. What was his name?

A. John Presson.

Q. Had Dr. Presson treated Mr. Walker for anything other than, say, an annual physical in the three-year period before his death?

A. He had a bout with kidney stones, and that was it.

Q. Okay. Nothing else?

A. No, sir.

Q. Was he taking any prescription medication in June of 2010?

A. Yes, sir.

Q. What was he taking?

A. He had moderate hyper -- hypertension, and he was taking that. That's it.

Q. Blood pressure medication?

A. Yes, sir.

## 16

Q. What was it; do you recall?

A. Diovan.

Q. Okay. Do you recall the dosage?

A. It was point 5.

Q. Milligrams?

A. Yes, sir.

Q. Anything else?

A. No, sir.

Q. All right. And in June of 2010 what was Mr. Walker's weight?

A. Two-o-five.

Q. His height?

A. Five-eleven.

Q. In the five years before his death had Mr. Walker been hospitalized?

A. Yes.

Q. And when was that?

A. January of that year he broke his ankle.

Q. Okay.

A. He fell on the ice in our driveway and broke his ankle, and he had to have that operated on, and he -- and he had had some kidney stones removed, same year.

Q. What hospital was he treated in for the ankle injury?

A. Kell West Regional in Wichita Falls.

1374

17

Q. Who was the orthopedic surgeon who operated on him?

A. David Huang.

Q. The same fellow who treated your arm?

A. Yes, sir.

Q. Okay. Who was the doctor who treated him for his kidney stones?

A. David Dowd, D-O-W-D.

Q. Was he hospitalized the same place for those?

A. Yes, sir.

Q. Is Dr. Presson kind of your family doctor?

A. Yes, he is.

Q. When did you and Mr. Walker buy the RV you were camping in, in June of 2010?

A. May 2010, three weeks earlier.

Q. Where did you buy it?

A. At Explore USA in Arlington.

Q. Now, that's a fifth wheel RV?

A. Yes, sir.

Q. And on the unlikely chance somebody in Comal County won't know what a fifth wheel is, tell me what a fifth wheel RV is as opposed to one of these big motor buses you see people driving.

A. It's a -- it's pulled by a pickup truck and the -- the hitch of it sets in the bed of the truck.

18

Q. Okay. What kind of vehicle did you pull it with?

A. We had a 2008 three-quarter-ton GMC Sierra pickup, diesel pickup.

Q. Okay. What were the dimensions of that RV? How long was it?

A. It was 38 foot long.

Q. And how wide, if you know?

A. I don't remember.

Q. Okay.

A. I don't remember.

Q. Did it have pullout sections or pop-outs?

A. Four.

Q. Okay. And when it was -- when all the pop-outs were out how many square feet did it have?

A. I don't remember.

Q. Okay. I assume it had a bath and a kitchen.

A. Yes, sir.

Q. Shower?

A. Huge shower, yes, sir.

Q. TV?

A. Two.

Q. Okay. Did you have a satellite TV antenna?

A. Yes, sir.

Q. Okay. Had you camped overnight with that RV

19

before June 9 -- or before June 7, 2010?

A. No, sir.

Q. This was the first trip?

A. Yes, sir.

Q. Okay. Had you ever been to the campground at Huaco Springs before June 7, 2010?

A. No, sir.

Q. How did you come to choose that campground?

A. I won that trip in a silent auction.

Q. Okay. And the trip -- the silent auction prize included one or two nights at Camp Huaco Springs?

A. Yes, sir.

Q. Am I pronouncing Huaco right?

A. I guess so. I don't know.

Q. It's H-U-A-C-O. Did you make a reservation? Was -- in other words, was the prize two free nights or was it a prize for two specific nights?

A. It was two nights camping and river rafting and then a trip to the -- the caverns, and it was just like a -- it was a piece of paper with that on it that I bid on at the silent auction, and it had the phone number on there and the -- and the website, so I went on the website and -- and it said just make your reservations in the e-mail, so I sent the e-mail and told them what date we were wanting to come, and they -- and they sent us

20

back a confirmation.

Q. Okay. Did the -- did you read the confirmation?

A. It just -- it just confirmed the dates we wanted is all it was.

Q. Do you recall if it had any language in there about limiting the liability of the campground or anything like that?

A. It didn't have anything but confirming the dates.

Q. Okay. Now, you went on the website for the campground and looked at that before you made a reservation?

A. I believe my sister-in-law did. I think I just sent them an e-mail.

Q. Okay. Had you -- before you made the reservation had you read any brochures or advertisements for Camp Huaco Springs?

A. No. I -- I looked them up in my Good Sam's book. I had a Good Sam's book.

Q. What did the Good Sam's book say about the campground?

A. It just gave a rating on there and said what amenities they had, what kind of hookups.

Q. Do you recall what the rating was?

1375

## 21

A. I don't recall exactly what the rating was.

Q. Did the Good Sam's book say anything about safety warning systems, anything like that?

A. I don't recall.

Q. Okay. Did you look at their website at any time before you made the reservation?

A. I don't think I did.

Q. Okay. Did you talk with anybody that worked for Rockin 'R' River Rides or any of the defendants before you made the reservation?

A. No.

Q. Now, you were traveling, I believe, with Caren and Terry Johnson, correct?

A. Yes.

Q. Terry's your brother?

A. Yes.

Q. Did they also have a fifth wheel?

A. They had a tongue-pull trailer.

Q. Okay. How long had they had that RV?

A. They bought it in 2008.

Q. Okay. Had they ever camped, the Johnsons, at Huaco Springs before?

A. No.

Q. Did they know anything about it that they related to you, about the campground?

## 22

A. No.

Q. What day did you arrive at the campground?

A. We got there on the 7th.

Q. What time of day?

A. It was in the evening, I think about — sometime in the evening.

Q. Sun up or down?

A. Oh, the sun was still up. It was late afternoon.

Q. Okay. When you got there did you go to the office that's there on the grounds and check in?

A. Yes.

Q. Now, did you check in or did Mr. Walker?

A. We — we stayed in the truck. We just — we both — I mean, we checked in, in the truck. They check you in.

Q. Okay. Is there a gate there?

A. Yes, sir.

Q. Okay. Do you recall any conversation with the person at the gate?

A. Yes. The — the gate guy let us in and gave us wristbands that they put on us and led us to our spot.

Q. Do you recall the number of your campsite?

A. I think it was 8 or 9.

Q. Okay. And the Johnsons were next to you?

## 23

A. Yes.

Q. And they were -- if you were in 8, they were in 9?

A. Yeah.

Q. All right. Did you have any discussions with anybody employed by any of the defendants when you checked in or anytime about water safety or warning systems?

A. No, sir.

Q. Okay. And the campsite was a concrete pad that fronted the river, correct?

A. Yes, sir.

(Exhibit No. 1 marked)

Q. Let me hand you what we've marked Exhibit 70 and ask you if that is a picture of your fifth wheel trailer and Caren and Terry Johnson's fifth wheel trailer.

A. That's -- that's my fifth wheel trailer and that's their tongue-pull trailer.

THE REPORTER: Can we go off the record?

MR. SEARS: Huh?

THE REPORTER: Can we go off the record?

MR. SEARS: Certainly.

THE VIDEOGRAPHER: We're off at 12:16.

(Discussion off the record)

## 24

THE VIDEOGRAPHER: Back on the record.

Q. (By Mr. Sears) As the reporter pointed out, I misstated the number of the exhibit. It's number 1. And I misspoke also when I described the Johnsons' trailer as a fifth wheel. But that is a picture of you and Mr. Walker's fifth wheel and their tongue-pull trailer, correct?

A. Yes.

Q. And the fifth wheel is the bigger trailer?

A. Yes, sir.

Q. Is the truck, pickup, parked next to the larger RV in Exhibit 1 the Dodge pickup that you -- or the -- pardon me -- the GMC pickup that you and Mr. Walker used to pull your fifth wheel?

A. Yes, sir.

(Exhibit No. 2 marked)

Q. Okay. Exhibit 2, which I'll show you, is a picture that I got from your lawyers, and there's some writing on it, and I believe Caren or Terry Johnson did the writing on the picture. Do you know if that's correct?

A. Yes, sir.

Q. Okay. Now, does Exhibit 1 accurately depict the location of your fifth wheel and your truck on the evening of June 8, 2010?

1376

**25**

A. Yes, sir.

Q. Did the position of your -- your trailer or truck change between the time that was taken, I assume the evening of June 8th, and the time you and Mr. Walker left the trailer to escape the flood?

A. No, sir.

Q. Okay. So when the water started coming up your trailer and your truck were in the same position shown in Exhibit 1, correct?

A. Yes, sir.

Q. Was the Johnsons' trailer in the same position shown in Exhibit 1?

A. Yes, sir.

Q. Okay. What did you and Mr. Walker do during the day of June 8th?

A. We went down the river on a two-man canoe with Terry and Caren.

Q. Okay. What -- was the river below the banks at that time?

A. It was low.

Q. Yeah.

A. It was real low.

Q. What time of day did you leave on that canoe trip?

A. It was probably 10:00 o'clock in the morning.

**26**

Q. What time did you return?

A. It took us around four or five hours, so -- I don't know. 2:30 or 3:00 --

Q. Okay.

A. -- maybe.

Q. What did you then do?

A. We went over to the caverns -- I think it's Longhorn Caverns or something -- and we went through the caverns.

Q. Okay. How long --

A. And --

Q. Go ahead.

A. And then we went to Applebee's and ate supper.

Q. Okay.

A. And came back.

Q. And what time did you eat supper?

A. It was early. Probably 6:00 maybe.

Q. What time did you get back to the campgrounds?

A. I think it was around 7:00 maybe.

Q. Did anybody in the party drink any alcohol during the day or during the course of dinner?

A. No.

Q. On Exhibit 2 there are two pictures, correct?

A. Uh-huh.

Q. Yes, ma'am?

**27**

A. Yes, sir.

Q. Okay. The top one, the writing next to it says --

MR. SEARS: Strike that.

Q. Let me ask you this. Who is the woman shown in the photo on the top of Exhibit 2?

A. That's Caren Johnson.

Q. Okay. Do you know who took this picture? Terry?

A. Probably Terry.

Q. Okay. The writing next to the top picture on Exhibit 2 says: After dinner Tuesday 6-8-2010, going to watch TV with Cindy and Norman. Have I read that correctly?

A. Yes, sir.

Q. Okay. Did Caren and Terry come to your trailer after dinner on the night of June 8, 2010, to watch TV?

A. Yes, sir.

Q. About what time?

A. I don't -- I don't know.

Q. Okay.

A. I don't remember.

Q. Do you recall what time they left?

A. No, I don't know. Probably around bedtime, I guess. I don't know. We didn't -- I don't know.

**28**

Q. What time would bedtime be?

A. Oh, we went to bed early. Probably around 9:00 or so, I guess.

Q. Did you and Mr. Walker and Caren and Terry Johnson watch TV in your trailer that night?

A. I'm sure we had the TV on. I'm -- I don't know what we would have been watching, though. We might have been watching a movie or something. TV reception wasn't very good.

Q. Okay. Do you recall what channels you were watching?

A. No, sir.

Q. Do you recall hearing any weather information, forecast, warnings, anything else that night between 8:00 and 9:00 p.m.?

A. No, sir.

Q. Did the fifth wheel trailer have a radio in it?

A. Yes, sir.

Q. Okay. And earlier, in Stephen Walker's deposition, questions were asked about a police scanner. Mr. Walker -- did Mr. Walker have anything like that?

A. No, sir.

Q. No CB radios, nothing?

A. No, sir.

Q. Okay. So you went to bed about 9:00 -- the

29

night of June 8th, correct?

A. Yes, sir.

Q. Did Mr. Walker go to bed at the same time?

A. Yes, sir.

Q. Now, do you remember making a video -- we've discussed it -- for your lawyers describing what happened that morning of June 9th?

A. Yes, sir.

Q. Do you remember when you made it?

A. I made it several months ago.

Q. Okay. And did you give an accurate description of the events of that night in that video?

A. Yes, sir.

Q. Have you had a -- have you ever seen the video?

A. No, sir.

Q. I want to show you parts of it and ask you about it, but would you be more comfortable if you saw the entire video before I ask you questions? We can take a break and do that if you'd like.

A. No, I'll watch it. That's fine.

Q. Ma'am?

A. It's fine. I'll watch it.

MR. SEARS: Okay. Let's go off the record and try to set this up.

THE VIDEOGRAPHER: 12:24.

30

(Recess from 12:24 p.m. to 1:49 p.m.)

THE VIDEOGRAPHER: This is tape number 2. We're back on the record, 1:49.

Q. (By Mr. Sears) What I'd like to do is show you a segment of the tape, which I believe you just had a chance to watch, correct?

A. Yes, sir.

Q. And then I want to ask you some questions about it. And we'll stop right now and he'll play it for you.

VIDEOTAPE: I believe it started raining -- I don't know -- sometime after midnight. I woke up and it was a huge storm with thundering and lightning and it was -- it was really loud. About 6:00 o'clock I looked out the window and I could see my brother beating on the window of his camper, and he was screaming, we've got to get out, look at the water. And I looked down and the water was coming up between our campers, and about that time his camper came floating towards our truck and our camper come floating towards our truck, and I turned around; it was the fifth wheel part hit me and it hit him at the same time, and I just saw his hands let go, and that's the last time I saw him, and I was under water. I could hear these guys yelling, and there was these two young firemen and they were behind me, and they swam up to me and he put his arms

31

around me and he said, don't move because if you fight me we're both gonna drown, and I said I can't -- I can't move, I can't do anything, I'm -- I'm done. He said, just -- just sit here a minute, and I said okay. So I said my name is Cindy Walker. I'm a retired police sergeant from Wichita Falls --

MR. VALENTINE: Stop there?

MR. SEARS: Stop there, yeah, please.

(End of videotape transcription)

Q. (By Mr. Sears) Okay. Now, is what is on the tape that we just listened to, is that accurate about what happened that night?

A. Some of it was -- was run together, but more or less.

Q. Okay. Let's -- I'll ask you some questions and we'll figure it out. I understood you to say that sometime after midnight the storm noise woke you. Is that right?

A. No.

Q. Okay. What -- did the storm noise ever wake you up?

A. No.

Q. Okay. You had walked your dog, I think, around 9:00 that night, correct?

A. Yes, sir.

32

Q. Was it raining then?

A. No, sir.

Q. Was it thundering and lightning or was lightning off in the distance?

A. No, sir.

Q. Was there anything at 9:00 p.m. the night of June 8, 2010, to indicate to you that a heavy rain was coming?

A. No, sir.

Q. Okay. You told me you went to bed around 9:00. When did you next wake up?

A. It was after 6:00, 6:00, 6:30, 6:00-ish.

Q. And did you wake up when you heard your brother screaming as you describe on the tape?

A. It was -- actually, it was my little Yorkie that woke me up, and she was barking and biting my hand and jumping out of bed and running to the living room, and she never acted like that. She's only a little two-pound Yorkie.

Q. Sure.

A. So I -- I got up and I went to the living room, and that's when I heard Terry screaming, and I guess that's why she was doing that. And I opened the blinds, and that's when I become aware of what was going on.

Q. When you opened the blinds what did you see?

33

A. Terry was beating on his camper window screaming, yelling and pointing at the water and yelling, we've got to get out, we've got to get out.

Q. Okay. And if he was beating on his camper window, I guess he was yelling at his wife?

A. He was yelling at me, screaming my name.

Q. Okay. Beating on his camper window?

A. Yeah.

Q. Okay. Show me in Exhibit 1 which window of his camper he was beating on.

A. It would have been not this one, but the one -- there's one right here on that -- facing this way.

Q. The one in the pop-out facing --

A. Yes.

Q. -- your trailer?

A. Yes, sir.

Q. Okay. But you never woke up from the time you went to sleep the night of June 8th until what you've just described, about 6:00 o'clock in the morning on June 9th, correct?

A. No, sir.

Q. Is that correct, you didn't wake up?

A. No, sir, I did not.

Q. Okay.

MR. MUELLER: You're still -- your --

34

your -- your answer is no, I didn't wake up, but he's asking you whether that's true, and the answer was yes, it is true that you did not wake up.

A. Yes, it's true.

MR. MUELLER: He understands what you mean, but --

Q. (By Mr. Sears) We've established that you didn't -- you didn't wake up that night, did you?

A. No, sir.

Q. All right. So there was nothing that occurred from the time you went to sleep the night of June 8th until the next morning about 6:00 a.m. to tell you that a substantial rain was falling, was there?

A. No, sir.

Q. Okay. Are you a light sleeper -- or were you at that time a light sleeper or a heavy sleeper?

A. I'm usually just -- I'm a pretty heavy sleeper, but I -- I take medication --

Q. Okay.

A. -- to make me sleep.

Q. Was Norman Walker a light sleeper or a heavy sleeper?

A. He was a heavy sleeper.

Q. Okay. Do you -- you wouldn't know if he woke up during the night, would you?

35

A. I don't think that he did.

Q. Okay. When you were awakened by your Yorkie, looked out, saw your brother, heard him screaming, how high was the water around your trailer or your brother's trailer?

A. It was up to the wheels. It was up to the wheels.

Q. Of your brother's trailer?

A. Yes, sir.

Q. All right. I'm going to hand you the court reporter's pen and ask you, on Exhibit 1, to draw a line indicating the water level that you observed on your brother's trailer when you looked out the window about 6:00 o'clock the morning of June 9th.

A. (Witness complies)

Q. Okay. And if you will, take the red pen the reporter just handed me and draw that line again so we can see it.

A. (Witness complies)

Q. There. Thank you.

MR. VALENTINE: Can I see that? Thank you.

Q. (By Mr. Sears) What did you then do? You've looked out the window, you've seen Terry Johnson beating on the trailer window, screaming we've got to get out.

36

What did you do then?

A. I started screaming at Norman to get up, we've got to get out of here, and I -- I ran in and grabbed my shorts, put on my shorts and my shirt, and he did the same thing, and I threw open the door and we ran out the door.

Q. Okay. When you came out the door how high was the water? Did you step off your trailer into it or was it above the bottom step of your trailer?

A. We had four steps on our camper.

Q. Yeah.

A. And it was up to the top step.

Q. Okay. But it wasn't coming in the camper yet?

A. By the time I got to the bottom step it was in our camper.

Q. Okay. So the river was rising pretty fast?

A. Yes, sir.

Q. During this time or anytime did you ever look back toward River Road, back away from the river, back up toward the office?

A. No, sir.

Q. Okay. You don't know what water was coming along that path?

A. No, sir.

Q. Okay. Did you get out first or did Mr. Walker?

37

A. He went out first.

Q. Okay. You were carrying the dog?

A. I had Sweetie Pie in my left hand and my -- my purse in my right hand.

Q. Okay. When you step out what do you and Mr. Walker then do?

A. I started -- I started towards the truck. Norman was already going towards the truck, and he just picked me up. He -- he had opened the door to the truck, and he picked me up and carried me and put me inside the truck.

Q. All right. Did he then close the door?

A. Yes.

Q. Was water running inside the cab of the truck at that time?

A. It was like an inch deep in -- in the --

Q. In the cab of the truck?

A. -- in the truck.

Q. The floorboards of the truck?

A. Yes, sir.

Q. What did Mr. Walker then do?

A. He started around the front of the truck.

Q. Okay. And the truck was still parked as illustrated in Exhibit 1, facing toward the river?

A. Yes, sir.

38

Q. Okay. Then what happened?

A. My brother was in the back of his truck at that time and he was screaming at Norman to get me out of the truck and come back around, and Norman couldn't make it all the way around. The water was too strong. He couldn't come around. He was gonna come around and get in the truck.

Q. Yes, ma'am.

A. And he couldn't make it around the front, so he come back around and he was -- he -- he tried to open up the back of the truck. And he had put the keys in his pocket. It was just a habit he had. He always put the keys in his pocket.

Q. May I stop you and ask you a question?

A. Yes, sir.

Q. You said he was going to open up the back of the truck. You mean the --

A. Back door.

Q. Back door. Okay. Go ahead.

A. And he was pulling on the back door of the truck, and he couldn't get the door open because --

Q. Were you --

A. -- the water was coming up.

Q. Were you in the backseat of the truck or the front seat?

39

A. Passenger front.

Q. What was -- do you know why he was trying to open the back door?

A. No, sir.

Q. Okay. He didn't try to open your door?

A. He tried to open my door first, but he didn't get it open, so he went to the back door.

Q. Okay. So your door is still closed?

A. Yes, sir.

Q. Okay. Then what happened?

A. I was on the phone with -- I had called 9-1-1 on my cell phone.

Q. Yeah.

A. And I was on the phone with the emergency dispatcher, and I was looking forward. I was looking at my bother, and I could hear him screaming at Norman. And the water was coming up, and I -- I just -- I was begging the dispatcher to get somebody out there to help us, and the water kept coming up, and I thought Norman went to the bed of the truck. I thought he was trying to climb in the bed of the truck. I didn't know what he was doing at that point.

Q. You couldn't see him?

A. I couldn't see him.

Q. So you don't really know whether he was trying

40

to climb in the bed or not?

A. No.

Q. Okay.

A. And I turned and I saw his hands on the bed of the truck, and the water kept getting deeper, and about that -- and I -- I was trying the handles, the door handles, but it was electric door lock and I didn't have the keys and the doors were locked, and then everything -- the truck started moving and everything in the truck came on; the radio come on, the air conditioner came on and the lights came on, and the wheels started turning and the truck started moving, and the water was up to the air conditioner and it was -- it was up -- it was coming up to here, and then the dispatcher said, I've got to put you on hold, stay with me. And I said, I can't, I'm gonna drown, and I just threw my phone down and -- and -- and I turned to look and -- and Terry's camper was coming towards me and our truck was going, and I -- his camper was coming and our truck was going towards our camper, and I turned to look at Norman and I just saw his hands go like that, and our camper hit me and every -- and I just turned upside down, and that's -- and I just saw brown water, and that's -- and I was under water, and that's -- I was just under water for the longest time and I was upside down, and I just started

kicking with my feet and I was -- I just -- I kicked and kicked and kicked and -- and I just thought, you know, I'm gonna drown, you know, I'm gonna drown, I've been swimming since I was three years old, and I'm gonna drown. And I kept kicking, and all of a sudden I felt glass break under my feet, and it just sucked me out. And I went for a long time, and finally my head popped to the top of the water and I got -- I got a breath of air, and then it sucked me back down, but I was -- I kept breathing all this tree bark, and I just went -- kept -- it just kept sucking me down and things kept hitting me and hitting me and -- and then I just kept going under and it just kept pulling me under, and then something hit me in my head, and I looked up and it was a white truck and it was -- it was Terry's truck and it was going down the -- down the -- the river and it was -- I could see the lights flashing and it -- I just went forever, just -- just -- it's like I was in that river forever and there was cars going by me and -- and then it was just like -- I don't know. I just kept going under and trees were hitting me and cars were hitting me, and I didn't see any more people. I was -- I saw nobody.

Q. When you said you saw Mr. Walker let go, what was he holding on to that he let go of?

A. He was holding on to the -- the bed of the truck.

Q. Okay.

A. He was holding on to the side of the truck.

Q. The side -- the side bed?

A. That side over there. He was holding on to the edge of the truck.

Q. He was holding on to the edge of the truck closest to the camper in Exhibit 1?

A. Right there. That -- the right side of the truck.

Q. Mark an X where he was holding on the last time you saw him.

A. (Witness complies)

Q. All right. Thank you, ma'am. Now, I understood you to say on this tape we just watched that the fifth wheel hit both of you. Did I understand what you said?

A. Yes, sir.

Q. That's not correct, then? The fifth wheel didn't hit you both? You were in the truck and he was out of it?

A. It did hit us both, yes.

Q. Okay.

A. It came down on top of both of us.

Q. When you were still in the truck and he was holding on, your trailer shifted, correct?

A. Yes, sir.

Q. Did the fifth wheel strike Mr. Walker, that assembly or the front part of the trailer?

A. Yes, sir.

Q. Okay. And then the fifth wheel hit the truck, and then that's when the truck turned over and you went under?

A. Yes, sir.

Q. Okay. Did you ever get into the bed of the truck?

A. No, sir.

Q. Did Mr. Walker?

A. Far as I know he didn't.

Q. Do you know if Mr. Walker was crushed between the truck and the fifth wheel assembly or the trailer before he was swept away?

A. My brother told me that he was.

Q. Okay. Terry?

A. Yes, sir.

Q. But the last time you saw Mr. Walker he was standing between the trailer and the truck on the side close -- or standing between the trailer and the truck, correct?

A. Yes, sir.

Q. Okay. Would you like to stop for a minute, ma'am?

A. No, I'm okay.

Q. Okay. Do you know how far you went down the river before you were rescued?

A. Several miles.

MR. SEARS: Okay. Why don't we take about ten minutes. Would that be okay?

MR. MUELLER: Yeah.

MR. SEARS: All right.

THE VIDEOGRAPHER: We're off the record, 2:08.

(Recess from 2:08 p.m. to 2:26 p.m.)

THE VIDEOGRAPHER: We're back on the record. Do you want me to start it?

MR. SEARS: No, no, no, no.

Q. (By Mr. Sears) Mrs. Walker, I'm going to show you one more brief segment of this video and then we'll go on to something else, but I'm going to come around to stand beside the videographer while he plays it so I can tell him when to start it and stop it. We'll do that, then I'll ask you a couple of questions.

VIDEO: So, you know, we didn't have any idea what was going on. And, you know, we've been camping for a couple of years and we've been at places

**45**

where they -- they at least tell you, you know, if -- if bad weather comes you go here, you do this or -- or they come around, beat on your door and say --

MR. SEARS: Stop there.

(End of videotape transcription)

Q. (By Mr. Sears) Were you able to hear that segment?

A. Yeah, I heard part of it, yes, sir.

Q. Okay. Where had you and Mr. Walker camped before you bought the trailer involved in the accident?

A. We had had a tongue-pull trailer before this one, and in 2009 we'd been to -- up through the Plains and Nebraska and Kansas and South Dakota.

Q. Where had you camped where people came and beat on your door and warned you about the weather?

A. Dodge City, Kansas.

Q. What was the name of that campground; do you remember?

A. I don't remember.

Q. Was that a potential flood or a tornado?

A. Tornado.

Q. Okay. Is that the only place you ever camped where anybody warned you in any way about the weather?

A. Yes, sir.

Q. Okay. Do you remember the names or know the

**46**

names of the, I believe, two firemen or two people who rescued you from the river?

A. I have that at home. I don't -- I don't recall the names.

Q. Okay. If you will, when you read your deposition put their names in. We'll leave a blank for it here.

A. Okay. (Information to be provided: _____ _____ )

Q. Did you tell them what had happened or do you remember?

A. I -- I told them where I had been staying and that I -- I wanted them to look for my husband and my brother. I know that.

Q. Do you recall any response they made to you?

A. They were just trying to get me out of the water.

Q. Okay. So you don't remember what they said?

A. No, sir.

Q. Do you know when the National Weather Service issued a flash flood watch for Comal County that night?

A. I have no idea.

Q. Okay. The pleadings filed in this case -- and I know your lawyer filed them -- say 3:00 a.m. Do you

**47**

know if that's correct or not?

A. I don't know.

Q. Do you know if any weather warnings were issued by the TV or radio stations at any time before 3:00 a.m. the morning of June the 9th, 2010?

A. I don't know.

Q. Do you know if the City of New Braunfels sounded any sirens or issued any warnings to their residents that night, June 8th and the morning of June 9th?

A. I wouldn't have any way of knowing that.

Q. Okay. Nobody has told you that?

A. No.

Q. Do you know if the Austin or San Antonio TV stations carried any warnings during that period?

A. I don't know.

Q. Weather warnings.

A. I don't know.

Q. Now, you were taken, I believe, to the emergency room at New Braunfels when they brought you out of the river.

A. Yes, sir.

Q. Bear with me one second.

MR. SEARS: If we can go off the record while I --

**48**

MR. MUELLER: Sure.

MR. SEARS: -- try to find this.

MR. MUELLER: Yeah.

THE VIDEOGRAPHER: We're off at 2:31.

(Discussion off the record)

THE VIDEOGRAPHER: Back on, 2:34.

Q. (By Mr. Sears) I'm looking at the record from the Christus Hospital in New Braunfels, and they list what they found when you came in after you were taken out of the river. They -- they list your injuries that they observed, and they are: Multiple contusions and abrasions to your upper left back, the back of your upper left arm, and multiple contusions to your buttocks and lower extremities and a laceration in your lower right arm. And that's what they list.

Was there any other part of your body besides what I've just read to you -- and I know you had something in your eye, but we'll come to that. Was there anything else that was injured besides what I've listed and the foreign body in your eye?

A. I had debris in my -- my ears and I had a bunch of foreign debris in my -- both eyes.

Q. Okay. Anything else?

A. I don't think so.

Q. All right. Do you remember telling anybody at

1382

**49**

the emergency room what happened?

A. Yes, sir.

Q. Who did you talk to -- well, let me back -- make it a little easier, if I can.

Dr. Flanagan was the doctor you saw at the ER, I believe.

A. Yes, sir.

Q. Did you tell him what happened?

A. I just told him that --

Q. Did you tell him what happened?

A. I don't believe I did.

Q. Okay. Who did you tell what happened at the emergency room?

A. I told the ER nurse and the social worker.

Q. Okay. Do you remember the ER nurse's name?

A. Do not.

Q. Do you remember the social worker's name?

A. No, sir.

Q. Okay. In the pleadings filed in this case, on page 4 in paragraph 16 the statement is made -- I'll let you read along with me -- the nurse treating Plaintiff Cynthia Walker informed her that flash flooding of the Huaco Springs campsite had been an ongoing problem since 1959. The attending nurse also informed Plaintiff Cynthia Walker the defendants had not established a

**50**

warning system in Plaintiff's camping area and people have died because of it in the past.

Is that what the nurse told you?

A. Yes, sir.

Q. Okay. And you don't remember her name?

A. No, sir.

Q. What did she look like?

A. She was about my height with dark hair.

Q. How old was she, roughly?

A. She was probably in her 50s.

Q. Do you recall about what -- was she stocky, thin, or in the middle?

A. She was a thin nurse. She was an R.N.

Q. How do you know she was an R.N.?

A. Because it said R.N. I can't remember her name, but she was an R.N. I remember that.

Q. Okay. Anybody else -- has anybody else other than your attorneys ever told you that -- ever told you something similar to what the nurse told you, what's set out in your pleadings about previous deaths at the Huaco Springs campground?

A. No, sir.

Q. It also says in your pleadings on page 4, paragraph 15: The defendants failed to notify the plaintiffs of the impeding severe weather. On June 9,

**51**

2010, the defendants had warned some campsites around 2:00 a.m. of the potential flooding of Guadalupe River, but failed to warn the plaintiffs' campsite.

Who besides your lawyers has told you that the defendants warned some of the campers or some of the campsites at 2:00 a.m. of the potential flooding of the river?

A. I believe the sheriff's department is the one that said that they were out there warning people.

Q. How did you learn of that?

A. We spoke to the sheriff's department.

Q. Who did?

A. (Indicating)

Q. I -- I don't want to know what your lawyers told you, I just -- did you speak to anybody with the sheriff's department?

A. Yes.

Q. Who did you talk to?

A. Was a deputy chief.

Q. Do you remember his or her name?

A. No, I don't remember.

Q. Do you recall about when this conversation took place?

A. It was back -- it's been -- it's back when I first retained Mr. Mueller as my attorney. It's been --

**52**

Q. Okay.

A. It's been a while.

Q. What did the deputy -- what did this individual from the sheriff's department tell you?

A. That they had deputies out there warning people of the flooding.

Q. Did the person from the sheriff's department specifically say that they sent deputies out to Huaco Springs to warn the campers there?

A. He said in the area.

Q. Okay.

MR. MUELLER: Can I see that, what you're referring to? I'm not -- I'm not sure that's right, but --

MR. SEARS: Right here. Paragraph 15.

MR. MUELLER: Okay. That might be -- that may be in error. That may be referring to the sheriff's department --

MR. SEARS: That's fine.

MR. MUELLER: -- coming around. I'll check on that for you.

MR. SEARS: That's fine.

MR. MUELLER: Okay.

Q. (By Mr. Sears) Now, did the -- the person from the sheriff's department say anything else other than the

53

sheriff's department sent people -- deputies out to warn people in the area, including Camp Huaco Springs?

A. I don't believe so. I don't recall.

Q. Have you ever talked to anybody who said that some people at some campsites at Camp Huaco Springs were warned of the potential for flooding between 2:00 and 4:00 a.m. in the morning of June 9th?

A. No, sir.

Q. Would you be critical of the sheriff's department if they did, in fact, send deputies to Camp Huaco Springs and those deputies only warned some campers and not all campsites?

A. I don't believe that the sheriff's department came to that campsite, actually.

Q. If the sheriff's department did, in fact, warn some campsites in Camp Huaco Springs that night, but the sheriff's deputies didn't ensure they warned all campsites, would you be critical of those sheriff's deputies?

A. Probably, but I -- under an emergency situation I'm sure they did what they could.

MR. VALENTINE: Object as nonresponsive.

Q. (By Mr. Sears) If, in fact, no flooding was occurring at that time, but the possibility for flooding existed and the deputies knew it, would you be critical

54

of them for warning some campsites and not all campsites?

A. Yes.

Q. And if you and Mr. Walker had received a warning from the sheriff deputies, I assume you would have left the campsite.

A. Yes.

Q. Okay. I -- I believe when you were at the emergency room Mr. Walker was still missing.

A. Yes.

Q. And you were informed there that a body had been found that fit his description.

A. It was several hours.

Q. Okay. And you personally went to the funeral home and identified the body?

A. Yes, I did.

Q. Okay. Did you, on the day of July -- June 9th -- pardon me -- travel back to Iowa Park or did you spend the night in the New Braunfels area?

A. My daughter took me home.

Q. Okay. Your daughter --

A. Jody.

Q. Jody, yeah. What time did you get back to Iowa Park on the 9th?

A. 7:00, 8:00 o'clock at night.

Q. Okay. And the next day you saw Dr. Presson.

55

your family doctor?

A. Yes, sir.

Q. At some point in time you went to the optometrist and had a -- something taken out of your eye, correct?

A. Yes, out of both eyes. I couldn't see. I didn't have any glasses and I couldn't see.

Q. When did you see the optometrist; was it the 10th or the 11th?

A. The -- I believe it was the 10th.

Q. Okay. And you saw Dr. Presson the 10th?

A. Yes.

Q. And I've got a page from his -- his notes of that visit, and he says: She had been on P-R-I-S-T-I-C -- T-I-Q, Pristiq, and all of this has been washed away with the flood.

A. Yes, sir.

Q. Pristiq is an antidepressant, isn't it?

A. Yes, sir.

Q. When was that first prescribed?

A. It was prescribed in January.

Q. Of 2010?

A. Yes, sir.

Q. Were you also taking Xanax before the flood?

A. I don't -- I don't know if I was or not. I

56

might have for maybe a week or two or something. I don't know. I'd just lost my mom too.

Q. I understand.

A. I don't -- I don't recall.

Q. Were there any other antidepressants besides Pristiq and possibly Xanax you were taking before the flood?

A. I don't know. I take a lot of medication.

Q. Well, let me ask you this. Do you recall the first time any antidepressant was prescribed for you, what year it would have been?

A. Probably 2009.

Q. Okay. I believe your mother passed away in -- well, what month in 2010?

A. Christmas Eve 2009.

Q. Okay. Do you recall when in 2009 the antidepressants were first prescribed, what month?

A. December.

Q. Okay.

A. Right after that.

Q. You'd never taken antidepressants before then?

A. No, sir.

Q. All right. Have you had any counseling, psychiatric or psychological or other counseling, regarding the mental anguish you've sustained as a result

57

Q. of Mr. Walker's death?

A. No, sir.

Q. Do you plan to seek any?

A. No, sir.

Q. Are you still taking antidepressants?

A. No, sir.

Q. When did you stop?

A. I stopped last year, about a year ago.

Q. About this time in 2011?

A. Yes, sir.

Q. And I assume you stopped because you felt that you no longer needed them?

A. Yes, sir.

Q. Let me show you something. I'm not going to mark it as an exhibit yet. I may not. Let me show it to you and ask you a question about it. It's a page from Kell West Regional Hospital and it's titled Medical Reconciliation List. And look at that and tell me if those are the medications you were taking on June 16, 2010.

A. Yes, but that -- the -- the Xanax, they had just given me that that day.

Q. Okay. That's -- and I highlighted the Xanax and the --

A. Yeah.

58

Q. -- Pristiq.

A. They -- they had given me that that day while I was there.

(Exhibit No. 3 marked)

Q. Is this document, which I'll now mark Exhibit 3, a complete list of the medications you were taking on June 16, 2010?

A. Yes, sir.

Q. And except for the Xanax, had you been taking all these medications prior to the flood?

A. Yes, sir.

Q. And I assume that most of them were for your MS.

A. Yes, sir, except for the Pristiq.

Q. Okay.

A. Yes, sir.

Q. All the other medications listed on Exhibit 3 you were taking because -- because of the multiple sclerosis?

A. Except for the Synthroid, which is for my thyroid condition, and Protonix, which is for ulcers.

Q. Okay. After the debris was removed from your eyes were you then able to see? Did you completely recover your vision?

A. Yes, sir.

59

Q. Okay. And were you wearing glasses prior to June 9, 2010?

A. Yes, sir.

Q. Has your prescription changed since then?

A. Yes, sir.

Q. Did the doctor -- eye doctor say anything about the change in your prescription being related to the debris you got in the flood?

A. I have a scar on my eye from the debris.

Q. Does that affect your vision?

A. I don't know if it does or not. I have -- I have some problems with my vision from the MS, so it's hard for me to tell.

Q. Okay. Then I believe you got an infection in your arm.

A. Yes, sir.

Q. And Dr. Presson referred you to Dr. Huang, who, I believe, reopened the incision that had been stitched up --

A. Yes, sir.

Q. -- at the emergency room and drained it.

A. Yes, sir.

Q. Have you recovered from that infection?

A. Yes, sir. They had to take out part of the muscle.

60

Q. Yes, ma'am. And you're showing me your right arm. There's a scar right above your elbow, correct?

A. Yes, sir.

Q. Okay.

MR. VALENTINE: Will you rotate that around, let me take a look. Rub your finger on it.

A. (Witness complies)

MR. VALENTINE: Okay. Thank you.

Q. (By Mr. Sears) Have you recovered from all the other injuries that we've talked about that you suffered in the river?

A. As far as I know.

Q. Physical injuries.

A. Yes, sir.

Q. Do you have any scarring besides the scar on your right arm you just showed me?

A. No, sir.

Q. Do you have any back problems you claim were caused by the accident or the trip down the river?

A. I don't think so.

Q. Okay. Are there any physical problems you currently have that you relate to what happened to you the morning of June 9, 2010?

A. I don't think so.

(Exhibit No. 4 marked)

1385

61

Q. Exhibit 4 is a three-page -- it's three pages from the Hartford Insurance Company that I'll number 1, 2, and 3. The first page of Exhibit 4 appears to be medical payment made under your personal injury protection coverage; is that correct?

A. Yes, sir.

Q. And it's a payment to Larry Gunnel, G-U-N-N-E-L, who, I believe, is your optometrist.

A. Yes, sir.

Q. And a payment to Christus Health, which is the San Marcos emergency room, a payment to Family Practice Associates and Dr. David Huang. And those are, I believe -- that's everywhere you were treated for the injuries you received in the flood, correct? Dr. Huang, Dr. Presson, the emergency room, and the optometrist?

A. Kell West is not listed.

Q. Okay. What -- my question is: How much out-of-pocket medical -- how much out of pocket did you have to pay for the medical treatments you received as a result of the accident of June 9, 2010?

A. I had -- I had -- I had several thousand dollars to Kell West that wasn't paid.

Q. Okay.

A. I don't see it here.

Q. What I'm looking for, ma'am -- and you may not

62

be able to tell me right now -- is the amount you paid over what insurance paid. Do you have records that would show you how much that was?

A. I have them somewhere. They're not -- they're not here, though.

Q. If you can, give your lawyer the records of payments -- out-of-pocket payments you made for the medical expenses incurred because of this accident, okay?

A. Okay.

Q. All right. Page 2 of Exhibit 4 reflects a payment of $5,300, and it's PIP coverage for a funeral benefit, correct?

A. Yes.

Q. Now, you've given us the funeral bill, and it's, I think, 8,400 and something dollars.

A. Yes, sir.

Q. Did you pay the -- the difference between what's shown on page 2 of Exhibit 4 and the total funeral bill out of pocket?

A. Yes, sir.

Q. Okay. And page 3 of Exhibit 4 shows a payment of $20,317.10. What was that payment for?

A. That went to pay off the truck.

Q. Okay. Did you receive any insurance payments for the trailer?

63

A. Yes.

Q. Okay. Which insurance company wound up paying that?

A. It was -- The Hartford insured the truck and the trailer, and it was actually 10,000 short on paying it off.

Q. The trailer?

A. Yes, sir.

Q. And they initially, I believe, denied coverage, claiming that they didn't have coverage for the flood, didn't they?

A. They didn't pay for the contents. They only paid for the -- the -- the trailer.

Q. Yeah.

A. They didn't pay for contents.

Q. Okay.

(Exhibit No. 5 marked)

Q. Look at Exhibit 5, if you would, and tell me if that's a list of the contents you furnished your insurance company.

A. Yes, it is.

Q. Is that a complete list of the contents you lost because of the flood?

A. Yes, sir.

Q. Were you ever paid for any of that?

64

A. No, sir.

Q. Okay. When Mr. Walker passed away did his pension from the police department stop?

A. Yes, sir.

Q. You received, I believe, a $7,500 death benefit, and that was it, correct?

A. Yes, sir.

Q. Did you receive about $360,000 in payment for life insurance benefits on Mr. Walker's death?

A. Yes, sir.

Q. Did you receive any other payments of any kind?

A. No, sir.

Q. You are not claiming you've lost any wages or wage earning capacity because of Mr. Walker's death or your injuries, are you?

A. No, sir.

Q. Okay. Have we covered all the property damage that you're claiming because of his death, the $10,000 difference between what the insurance paid and what the trailer was worth and the items listed on Exhibit 5?

A. I don't understand your question.

Q. Is there any other property, personal property to start with, that you're claiming was lost or damaged because of the flood than what you've listed on Exhibit 5?

1386

**65**

A. No, sir.

Q. And as far as the -- the truck was totaled, correct?

A. Yes, sir.

Q. And we've talked about the insurance only paid a certain amount on the trailer and you had to pay $10,000 to pay off the loan, correct?

A. Yes, sir.

Q. And I assume you never replaced the trailer.

A. No, sir.

Q. Now, you are suing for mental anguish and loss of consortium, correct?

A. Yes, sir.

Q. I need to ask you some questions about that. Bear with me. Some of them will seem personal, but I have to ask them.

We've talked about your financial affairs, and you were -- you told me, as I understood, that you handled those and you're still handling them just like you were before his death. You're paying the bills and taking care of things, correct?

A. Yes, sir.

Q. Do you have any physical problems that you claim are being caused by the mental anguish?

A. Physical problems?

**66**

Q. Yes, ma'am.

A. Not -- not that I know of, no.

Q. Okay. Has any physician said, you're having these problems and I think they're caused by your grief or mental anguish?

A. My neurologist has asked me several times to go back into therapy, but I -- I just haven't done it.

MR. MUELLER: I don't think that's what he's asking. I think he's trying to find out, for example, if your MS or anything like that is -- anybody's told you that that's made worse by it or something like that.

MR. SEARS: That's correct.

MR. MUELLER: I'm not trying to coach you, I'm just -- not the other way around.

A. No. No.

Q. (By Mr. Sears) Now, neurologist said you should go back into therapy. When were you in therapy?

A. I had had some counseling after my mom died.

Q. Okay. Who was the counselor?

A. Susan somebody. I don't even remember her name. It was just for a couple of months.

Q. Is Susan in Wichita Falls?

A. Yes, sir.

Q. Is she a psychiatrist or psychologist?

**67**

A. Psychologist.

Q. Okay. Had you ever had counseling before?

A. No, sir.

Q. Does the mental anguish affect your relationship with your children?

A. No, sir.

Q. With your stepchildren, Norman's children?

A. No, sir. I'm very close with all my children.

Q. Okay. Does it affect your relationship with Terry and Caren Johnson?

A. No. We're very close.

Q. Or anybody?

A. No, sir.

Q. And you're not taking any medication for any depression at this point in time. We've talked about that.

A. No, sir.

Q. You haven't for a year. In spite of this mental anguish you're able to take care of yourself and function.

A. Yes, sir.

Q. And I assume, like most folks our age, you have kind of a daily routine.

A. Yes, sir.

Q. And you follow that in spite of your mental

**68**

anguish.

A. I try to.

Q. And it -- the mental anguish does not disrupt your daily routine and your ability to take care of yourself, does it?

A. I try to take care of myself because I -- I take care of my dad too and it -- I keep busy.

Q. Okay. Thank you, ma'am. Tell me again when the -- the MS was diagnosed.

A. December 2005.

Q. All right. Has it stayed the same or progressed or gotten worse?

A. It's gotten worse.

MR. SEARS: I thank you for your time. I'll pass the witness.

THE WITNESS: Thank you.

MR. MUELLER: Thank you.

THE VIDEOGRAPHER: We're off the record, 3:06.

(Recess from 3:06 p.m. to 3:16 p.m.)

THE VIDEOGRAPHER: This is tape number 3. We're back on the record, 3:16.

EXAMINATION

BY MR. VALENTINE:

Q. Ms. Walker, my name's Tom Valentine. I

1387

69

represent one of the defendants in this lawsuit as well, and I want to ask you a few questions. Mr. Sears covered everything pretty thoroughly. I might have missed a few things here and there, so if I jump around will you please bear with me?

A. Okay.

Q. And if I ask you something that doesn't make sense, please tell me, because I have a tendency to do that every once in a while, okay?

A. Okay.

Q. All right. When you first started giving your testimony, going through your marital history I -- did your first husband die when -- in 1975?

A. June 6, 1975, yes.

Q. That would have made you a very young woman at that time.

A. Twenty-one.

Q. What happened?

A. He committed suicide. He was just home from Vietnam.

Q. And then you had been married to Mr. Walker 18 years?

A. Twenty years.

Q. Twenty years at the time of this accident?

A. Yes, sir.

70

Q. Are there any other children of Mr. Walker that are not named in this lawsuit?

A. No, sir.

Q. You talked about being diagnosed with -- was it MS in 2005?

A. Yes, sir.

Q. Would you tell me how -- or what the effects on your daily life the multiple sclerosis has?

A. I have -- I have little or no feeling in my left arm and I have a lot of pain in -- in my back, my neck, and my -- my feet, and I have a lot of muscle spasms and I have frequent relap -- I have relapsing remitting multiple sclerosis and I have, from time to time, relapses, and when that happens I have to have rounds of IV steroid treatment.

Q. Okay. Are you still able to care for yourself during those times or does someone have to come take care of you then?

A. I have a nursing service that comes in and takes care of me, and my daughter and my granddaughter help.

Q. Has your doctor told you how he sees this playing out over the next 20 years?

A. He said at some point I'll probably be in a wheelchair.

71

Q. Has he given you any indication as to when you might expect that or --

A. There's no way of knowing.

Q. Okay. The -- speaking of Mr. Walker's health now, he was on high blood pressure pills?

A. Yes.

Q. Was there anything else that he did that would take him back to his doctor on a regular basis?

A. He had a physical once a year, and he was in excellent health. He worked out three days a week. He was a weightlifter. He did power lifting, and he was bulked up. He had a -- I mean, he was -- he was a physical specimen. I mean, he was -- he was in -- he was in great shape.

Q. The -- that kind of goes with -- he helped carry you to the truck --

A. Yes.

Q. -- on the night of the accident?

A. Yes. He stayed -- he stayed in good shape because his -- his plan was he was gonna stay in good shape to take care of me.

Q. Sure.

A. That was his job.

Q. I -- describe for me when you stepped out of the travel trailer; was the water to the middle -- would

72

it be to the -- I mean, if you're not walking, your husband would be walking. Would it be like above knee-deep, but not to your waist? About where is it at? Because I'm having --

A. It was --

Q. -- kind of a hard time.

A. It was past my knees when I --

Q. Did you step out the first time actually into the water?

A. When I stepped -- our travel trailer was high. It was -- it was -- it was one of the biggest ones you could buy, and it had four steps.

Q. Okay.

A. And when I got to the bottom step it was past my knees. It was already going into our camper.

Q. Okay.

A. And I took about two steps towards the pickup when he picked me up, and that -- that was --

Q. That's what I'm interested in, those two steps towards the pickup. Where would you --

A. I couldn't go --

Q. -- put them on your legs?

A. It was mid-thigh.

Q. Okay. How tall are you?

A. Five-four.

1388

**73**

Q. I was looking at a picture of your fifth wheel and I could tell -- it looked like on the roof that you had the antenna raised up. Did you raise the antenna from the inside with a crank?

A. It was a button.

Q. You pushed it and it just raised up?

A. Yes, sir.

Q. Did the park have cable or were y'all watching TV over the air?

A. It was just a satellite thing. I -- I don't know.

Q. Okay. I'll speak a little bit from my own experience having one of these too. I've got an aerial that raises up like you can see in Exhibit 1, if you want to look at Exhibit 1. Okay. You see where the -- can you see the aerial sticking up?

A. Yes, sir. Yes, sir.

Q. Okay. That, to me, looks like the antenna for local TV. Mine has a dish that raises up --

A. Yes, sir.

Q. -- for Direct TV.

A. Uh-huh.

Q. And you have to aim it and point it and all that. Did yours have a satellite dish as well?

A. It had -- it had buttons inside where you

**74**

could -- where you could -- it had like a power booster thing where you hit it and -- and then it had -- I think Norman hooked it up to that box. I guess it was cable and --

Q. Okay. Well, that's what I'm trying to figure out. And we can figure out what the park provided. I can ask --

A. Yeah.

Q. -- those folks.

A. I don't know. He hooked it up, I didn't.

Q. Did y'all have Direct TV or any sort of dish TV that would -- that would work in your travel --

A. No.

Q. -- in your RV?

A. No.

Q. Okay. So you would have been either getting -- if y'all watched TV that night -- and you had said something about having bad reception -- been either getting TV over the air, the local channels, with your antenna --

A. Yes.

Q. -- or possibly from whatever might have been at the park.

A. Yes.

Q. Okay. And do you have any recollection one way

**75**

or another on what might have been on TV that night?

A. I don't have any idea.

Q. Okay. How long had -- you had had another RV before this one, right?

A. Yes, sir.

Q. How long had y'all had that?

A. We got it in 2008.

Q. Okay. Did y'all go pretty regularly with it?

A. We went -- we went some, not -- not every weekend or anything. We went -- we went eight weeks at one time during 2009 and then we went a few other times.

Q. Did y'all ever stay at any other campgrounds that were near the river or creeks or on the water?

A. We stayed at one, one time, a KOA in north -- north Jackson Hole, Wyoming. Mostly we stayed at KOAs and places that had all the amenities and --

Q. Okay.

A. -- stuff.

Q. Was the KOA that you stayed at in Jackson Hole, was it -- I don't even know what rivers are up there. Was it on a river?

MR. SEARS: Snake.

A. Yeah. Yes, sir.

Q. (By Mr. Valentine) The Snake River?

A. I suppose.

**76**

Q. When y'all stayed at that KOA did -- was there ever any discussions about being in a river bottom or near a riverbank and watch for rising waters or anything like that?

A. We were up in the mountains at -- we were at the -- the place, the people lived there, and they give you a form and -- and it tells you in -- in case of an emergency what to do and -- and, you know, what all the facilities are and everything. Every place you checked in to they give you a form and tell you what to do and numbers to call in emergencies and stuff like that. Every -- every campground, especially KOAs, do that, and there's always people there on site.

Q. Okay. The -- the form that you got when you went to the KOA in Jackson Hole, did they have any warnings about what to do if there was rapid snow melts or rising water from the rivers or anything like that?

A. It was in July. There was -- there was nothing going on.

Q. Did the form have anything like that on it?

A. I don't -- I don't remember --

Q. Okay.

A. -- anything.

Q. Tell me, if you can, the KOAs that you can recall camping at.

**77**

A. Oh, we went -- we were in two or three in Kansas and two or -- one or two in Wyoming and stayed in one in Rapid City, South Dakota, and we stayed at one in -- outside of Yellowstone, but it wasn't in Yellowstone Park, it was in the -- in the town outside the gates there at Yellowstone, whatever the town is there.

MR. SEARS: Cody.

A. Yeah, whatever it is. We -- we weren't in the park, we were in the --

MR. MUELLER: Depends which side of the park you were on.

A. Yeah, we were in the town. We weren't up in the park.

Q. Okay.

A. And then we were in Creede, Colorado; and Red River, New Mexico; and South Fork, Colorado; and Salt Lake City. Did I say Dodge City, Kansas?

Q. You said two or three in Kansas.

A. Yeah, Dodge City, Kansas.

Q. Okay.

A. And one in Nebraska, but I don't remember the name of the town.

Q. Do you recall any of these other parks handing out any fliers or having information of what to do if

**78**

there were any sort of flash flooding or rapid water rising or anything like that?

A. Not specifically flash flooding. I remember them -- they always handed you a brochure when you check in on all their amenities and their emergency numbers and emergency places, like their -- their police numbers, everything, all their emergency contacts, everything they -- and, you know, where all their facilities are and -- I mean, they all give you stuff with -- just like checking into a hotel; they give you all their information.

Q. Okay. Do you recall ever reading anything that warned of any particular dangers or hazards or risks associated with being in any of those campgrounds?

A. Well, the ones -- most of them give you -- that we went to give you warnings about bears, most of them

Q. Okay.

A. Because the bears will --

Q. Anything else other than bears?

A. No, I -- I mostly remember about bears.

Q. Okay.

A. If you leave food out the bears will get in there and tear you up.

Q. Did you remember the one in Kansas where the -- where the tornados came? Did it have anything in it

**79**

about --

A. Yes.

Q. -- watch out for tornados?

A. They -- they said if the -- if the storm sirens sound to come to the office or we will come and warn you. And that's exactly what happened.

Q. Okay. Can you recall anything that ever had to do with water rising or --

A. No, sir.

Q. -- floods?

A. No.

Q. Before y'all got your bumper-pull did y'all camp?

A. Yes.

Q. Okay. Have you ever stayed, like I asked your stepson, on river bottoms or creek bottoms or riverbanks when you camped?

A. No, sir.

Q. Had you ever had any discussions with Mr. Walker prior to this accident about camping near riverbanks or on a river bottom area and watching out for rising waters or flash floods?

A. No, sir.

Q. Okay. Did you go to the deer lease with your husband?

**80**

A. Yes, sir.

Q. My wife goes with me. Switch gears real quick. In your lawsuit papers there is an allegation about a tire flattener. Do you know what I'm talking about?

A. Yes, sir.

Q. Tire flattener?

A. Yes, sir.

Q. And that somehow having something to do with what happened to your husband. What is your understanding -- and if it's only based on what your lawyer told you, I don't want to know, but if you have a belief or a thought or an understanding as to why that had some impact on the events made the basis of this lawsuit, I'd like to know what that is.

A. It's just my feeling that those -- those spikes that were there prevented -- might have prevented the sheriff's department from entering that camp to warn us because you couldn't get in that camp.

Q. Let me show --

MR. VALENTINE: What's the next exhibit, ma'am?

THE REPORTER: 6.

(Exhibit No. 6 marked)

Q. Let me show you what's been marked as Exhibit

1390

**81**

No. 6, and it's kind of a map of the campground. Does that kind of look familiar to you if I represent to you this is spaces 8 and 9?

A. Yes.

Q. This is kind of the office?

A. Yes.

Q. And this is one entrance and this is the other one, and that's where the spikes were?

A. Yes, sir.

Q. Okay. Will you circle for me where your recollection of the tire spikes were?

A. That's where the tire spikes are now? Is this -- is this current?

Q. Yes, ma'am. And I don't know if they've changed or not. I don't think they have, but if you think they've changed and they're in a different location, that's what I need to try to figure out.

A. This is where we were. I thought there was an exit right in through here.

Q. I've got it upside down, but this is River Road.

A. Yes. And this is where you come in.

Q. Here's the main entrance into the --

A. Yeah.

Q. -- campground here, and if you go that way, you

**82**

go down to where the tents are.

A. Yeah.

Q. And then there's an exit here.

A. Right.

Q. And I'm not sure about -- except all the way down at the very end where the turnaround is.

A. Yeah. I thought there was -- and this is all that pipe fence right here.

Q. Yes, ma'am.

A. And this is the only exit.

MR. MUELLER: Are you asking him or telling him?

A. No, there is only one exit, and that's where the things are.

Q. (By Mr. Valentine) If you'll circle that for me. That's where the --

A. Yeah.

Q. -- the spikes or the tire flatteners are?

A. Yes, sir.

Q. Okay. And we'll turn it over if you want some -- want a little bit --

A. It's just -- it's hard because it's upside down.

Q. Will you circle where you and -- had your RV parked?

**83**

A. (Witness complies)

Q. That's yours?

A. Uh-huh. Yes, sir.

Q. And your eyes are probably better than mine. What number space is it?

A. Eight.

Q. Number 8? Okay. And you know -- you're not suggesting that the sheriff's office couldn't get in through the main entrance because of these spikes over here, are you?

A. When we -- when we would go in through this gate -- this gate has a swinging arm.

Q. Okay.

A. And there was always an attendant at that gate.

Q. Okay.

A. And they would close this gate at a certain time.

Q. Okay.

A. And if that attendant wasn't at that gate, you couldn't get in. So I don't know if that gate was open or not.

Q. That's fair enough. And as a lawyer when I get a witness to say they don't know, then I don't have to worry about them coming and telling me something later. So do you know on the night of the incident whether that

**84**

gate was closed or not that would have --

A. I don't --

Q. -- blocked the sheriff's office from getting through?

A. I don't -- I don't know.

Q. All right. Had you ever been on the Guadalupe River before?

A. Never.

Q. Had Mr. Walker ever been on the Guadalupe before?

A. No, sir.

Q. When you came out did you see any people on top of the office?

A. When I came out of the camper?

Q. Yes, ma'am.

A. No, sir.

Q. Did you ever see -- and when I say the office, you know what I'm talking about, don't you?

A. Yes, sir.

Q. There's a little store down on the first -- down on the bottom. Did you ever see anybody up on the roof of that building?

A. I -- I couldn't see that building.

Q. Okay.

A. All I could see was my brother and my

85

sister-in-law and Norman. It was raining so hard I couldn't see anything.

Q. Okay. Was the -- was y'all's truck still facing towards the river?

A. Yes, sir.

Q. I suspect it was a very short time. I want to make sure, though. From the time -- can you estimate for me from the time you woke up and saw the water until the time you stepped out of your fifth wheel how many minutes went by?

A. I'd say less than five minutes.

Q. Less than five? Less than five is -- is a fair estimate, and I appreciate that. It could have been a matter of seconds or was it more a matter of minutes, but less than five?

A. It could have been two minutes. It was fast. It was quick.

Q. Okay. Somewhere between two to five minutes would be your best estimate?

A. Yes, sir.

Q. Okay. Do you get any survivor benefits at all?

A. No, sir.

Q. I don't want your full Social Security number, but can I have the last four digits, please.

A. 3275.

86

Q. Do you remember Mr. Walker's?

A. 1020.

Q. Your conversations with the sheriff's deputy, can you describe -- did you talk to more than one sheriff's deputy or just the one you told us about earlier?

A. We -- we spoke to two --

Q. Can you --

A. -- at the same time.

Q. Okay. Can you describe them for me?

A. I'd asked for the open records for a copy of the 9-1-1 call that I made, and they said they didn't have them, they didn't have them, and he said that floods like that happen all the time, that -- and that they had been out there trying to warn people.

Q. Okay. Well, can you -- did you see these deputies in person?

A. At the -- at the sheriff's department. I went -- we went there.

Q. Can you describe them for me?

A. The deputies?

Q. Uh-huh.

A. One was an older guy, and he said he was the chief deputy.

Q. Chief deputy?

87

A. He was a rude individual.

Q. Comal --

A. I'm sure there's more than one there.

Q. Comal County?

A. Yes.

Q. So Comal County Sheriff's Office's chief deputy, older guy.

A. Yes.

Q. Rude. Skinny or fat?

A. Skinny.

Q. How old do you think?

A. Sixty.

Q. White?

A. In his 60s. Yes.

Q. Okay. What does the other sheriff's deputy look like?

A. He was a -- in his 40s and he was a deputy. I think he was the public information guy.

MR. MUELLER: I'll check and see if I have some notes. I was out there. I don't remember if I have anything to identify who they were or not.

MR. VALENTINE: I don't think it's going to wind up being Klein or Prescott based on how she's described them.

Q. (By Mr. Valentine) You didn't speak to any

88

ladies?

MR. MUELLER: And I can't help you with what they looked like.

Q. (By Mr. Valentine) You didn't -- you didn't talk to any --

MR. MUELLER: Too old.

Q. -- lady deputies?

A. Oh, the lady that come out was a secretary.

Q. Okay.

A. She come out and then she sent them out.

Q. Do you recognize the name Deputy Klein or Deputy Prescott?

A. I -- I didn't get their names.

Q. Okay. Cell phone -- you talked about calling 9-1-1 on your cell phone.

A. Yes.

Q. You were already in the pickup when you called 9-1-1?

A. Yes, sir.

Q. Did you get through the first time or did you have any problems?

A. I got through the first time.

Q. Did you call anybody else?

A. I didn't have time.

Q. Did you happen to ever think, I'm going to save

**89**

my cell phone records and -- that shows what time I made this call?

A. No, I didn't think about it.

Q. And I may be assuming something that doesn't even exist. Do your cell phone records or your cell phone bills show your calls?

A. They do, but I didn't -- I didn't think to save them. I -- I got -- had to get new cell phones and --

Q. Okay. Who's your cell phone provider?

A. Sprint.

Q. And they were the cell phone provider at the time?

A. Yes, sir.

Q. What's your cell phone number?

A. I have a different number now.

Q. The one at the time.

A. (940) 636-0891.

Q. So your cell phone number at the time of the incident was through Sprint and the phone number was (940) 636-0891?

A. Yes.

Q. And whose name was it under?

A. I believe it was in my name.

Q. Current cell phone, Sprint?

A. Yes.

**90**

Q. What's the number?

A. (940) 224-0706.

Q. Did you change that because your phone got destroyed in the flood or anything or did you just -- something completely unrelated to this lawsuit?

A. I just got a new phone.

Q. Did you have a lapse in time when you weren't a Sprint customer?

A. No.

Q. Did y'all normally go to bed around 9:00 o'clock?

A. I always went to bed early. Norman usually stayed up late, but we had been on the river all day and then we went to the caverns and we were exhausted.

Q. Okay. So both of y'all went to bed about 9:00 o'clock?

A. Yeah.

Q. What was the normal time each one of you got up if you hadn't been on the river or been to the caves, just regular --

A. Got up?

Q. Yeah.

A. Usually around 6:30, 7:00.

Q. You retired people.

A. He worked out every morning.

**91**

Q. There have been witnesses that have described some campers as trying to hook up their motor home or their trailers to their trucks and -- and hollering at them to get out of there and quit worrying about it, get up here by the office. Was there any evidence or was -- do you have any recollection of anybody else trying to hook up their travel trailers while you were outside?

A. While I was outside? No, I don't remember.

Q. I know it was a short time.
And before you left the trailer did Mr. Walker try to hook up his trailer?

A. No.

Q. Okay. Other than people at the hospital and sheriff -- the two sheriff's -- the deputy chief and the deputy, have you spoken to any other government personnel or law enforcement personnel about this incident?

A. I talked to some people at the fire department and the firefighters and I had my -- my police department, and my brother is a police chief, and both of those departments had issued commendations to the firefighters and the fire department to those firefighters and -- for rescuing me and for recovering Norman and to that extent.

Q. How long were you in the water?

A. Probably an hour or longer.

**92**

Q. Were you floating the whole time or did you find something to hang on to?

A. I -- I thought I was on a log, but it turned out to be a whole tree, and then it kept pulling me under and -- and that's when I found out it was a tree instead of a log and -- and I let go of it, and then when I went over the top of the Gruene bridge I got an inner tube after I went by that building that had been destroyed. All the inner tubes were out there and I got one of the inner tubes, and after I passed Schlitterbahn there were more tubes out there, and I got one of those and then that's when -- Mr. Johnson was running along the bank and heard me screaming and he told me there was a tree down in the middle of the river, and I finally saw a tree that I could get on and I let go of the inner tube and hit dead center on that tree. That's the first time I saw a tree in the middle of the river I could maneuver.

Q. Okay. Does the scar on your arm bother you or are you embarrassed by it or anything like that?

A. No, sir.

Q. Did you see anything at Camp Huaco Springs that led you to believe there was any drainage blockage, culverts blocked, anything like that?

A. I don't -- I don't know what you mean.

Q. That means you probably didn't see anything.

**93**

Did you say -- see anything block -- you know what a culvert is, right?

A. Yes.

Q. Did you see anything blocking any culverts, any drainage grades, anything like that?

A. I didn't notice anything like that.

Q. Okay. Did you see any water coming up from above River Road -- it's where Dry Creek was. Did you see any water coming down towards y'all from a direction other than the river?

A. You mean at the time this was going on?

Q. Yes, ma'am.

A. I saw water coming from every direction.

Q. Okay. If water's flowing fast enough it'll make rapids and white water. You know that, right?

A. Yes, sir.

Q. Did you see any white water or rapids or anything flowing from something that led you to believe that it was something other than the Guadalupe River itself?

A. I don't know. I just saw water coming from every direction. I didn't know where it was coming from.

Q. That's fair enough.

MR. VALENTINE: Ma'am, I thank you for your time, and I'm very, very sorry to hear about the

**94**

loss of your husband.

THE WITNESS: Thank you.

MR. MUELLER: I want to thank everybody for being so considerate of the clients. I appreciate it.

THE VIDEOGRAPHER: We're off the record, 3:49.

(Deposition concluded at 3:49 p.m.)

**95**

CHANGES AND SIGNATURE

PAGE/LINE    CHANGE            REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

**96**

I, CYNTHIA WALKER, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.


_____

CYNTHIA WALKER

THE STATE OF _____)

COUNTY OF _____)

Before me, _____, on this day personally appeared CYNTHIA WALKER, known to me (or proved to me under oath or through _____) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this _____ day of _____, _____.


_____

NOTARY PUBLIC IN AND FOR

THE STATE OF _____

COMMISSION EXPIRES: _____

1394

CAUSE NO. C2012-0796D

CYNTHIA WALKER, ) IN THE DISTRICT COURT OF
INDIVIDUALLY AND ON )
BEHALF OF THE ESTATE OF )
NORMAN WALKER, STEPHEN )
WALKER, STEPHANIE )
WALKER HATTON, JORDAN )
WALKER, CAREN ANN )
JOHNSON AND TERRY )
JOHNSON )
)
v. ) COMAL COUNTY, TEXAS
)
UME, INC., D/B/A CAMP )
HUACO SPRINGS, WWGAF, )
INC., D/B/A ROCKIN 'R' )
RIVER RIDES, WILLIAM )
GEORGE RIVERS AND )
RICHARD DUANE RIVERS ) 433RD JUDICIAL DISTRICT

REPORTER'S CERTIFICATION
DEPOSITION OF CYNTHIA WALKER
DECEMBER 13, 2012

I, TEENA L. HARMON-DAVIS, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, CYNTHIA WALKER, was duly sworn by me and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the deposition transcript was submitted on _____ to the witness or to the attorney for the witness for examination, signature and return to me by _____;

That the amount of time used by each party at the deposition is as follows:

Mr. Sears - 1 hour:42 minutes
Mr. Valentine - 0 hours:33 minutes
Mr. Mueller - 0 hours:00 minutes

That pursuant to information given to me at the time said testimony was taken, the following includes counsel for all parties of record:

Mr. Mark R. Mueller, Attorney for the Plaintiffs
Mr. John T. Sears, Attorney for Defendant Rockin 'R' River Rides
Mr. C. Thomas Valentine, Attorney for Defendant Camp Huaco Springs

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Further certification requirements pursuant to Rule 203 of TRCP will be certified to after they have occurred.

Certified to by me this _____ day of _____, 2012.

TEENA L. HARMON-DAVIS
Texas CSR No. 4900
My Commission Expires: 12/31/2012
U.S. LEGAL SUPPORT, INC.
Firm Registration No. 341
701 Brazos, Suite 380
Austin, Texas 78701
(512) 292-4249 or (800) 734-4995

FURTHER CERTIFICATION UNDER RULE 203 TRCP

The original deposition was/was not returned to the deposition officer on _____;

If returned, the attached Changes and Signature page contains any changes and the reasons therefor;

If returned, the original deposition was delivered to _____, Custodial Attorney;

That $_____ is the charge to the Defendants for preparing the original deposition transcript and any copies of exhibits;

That the deposition was delivered in accordance with Rule 203.3, and that a copy of this certificate was served on all parties shown herein on and filed with the Clerk.

Certified to by me this ___ day of _____, ____.

_____
TEENA L. HARMON-DAVIS
Texas CSR No. 4900
My Commission Expires: 12/31/2012
U.S. LEGAL SUPPORT, INC.
Firm Registration No. 341
Austin Centre
701 Brazos, Suite 380
Austin, Texas 78701
(512) 292-4249 or (800) 734-4995

# TAB 5







After dinner Tuesday, 6-8-2010, going to watch TV with Cindy & Norman.



Cindy & Norman's RV & truck. 6-8-2010 evening



Δ π EXHIBIT 2
Deponent CW
Date 12/13/12 rptr. TD
WWW.DEPOBOOK.COM

THE HARTFORD

EXHIBIT
Deponent
Date 2/13/18 Rptr. TD
WWW.DEPOBOOK.COM

San Antonio Personal Lines Claim Service Center
P.O. Box 14261
Lexington, KY 40512-4261
1-800-236-0398 x 31166

003307
CYNTHIA WALKER
PO BOX 539
IOWA PARK, TX 76367

## Explanation of Benefits

Page 1 of 1

**Attention:** This remittance incorporates 1 claim payments

**Special Handling ID:** RM  00

| Invoice Number | Claim Number/ Date of Loss | Insured Name/ Claimant Name | Amount Paid |
|---|---|---|---|
| | YYZAF 46226 06-09-10 | NORMAN WALKER CYNTHIA WALKER | $1,108.55 |

Service Dates

Nature of Payment: NFB MEDICAL

Additional Comments: payment for out of pocket expenses due to  Larry Gunnel OD dos 6-10-10 $41.74    Christus Health $463.65  Family Practice Assoc  dos 8-17 $45, $3 45.35 David Huang dos 6-16-10 $212.81

Paid on behalf of: SOUTHERN COUNTY MUTUAL

Claim Handler:  Michelle Ramos    1-800-236-0398 x 31166

Claim Center:  San Antonio Personal Lines Claim Service Center
P.O. Box 14261
Lexington, KY 40512-4261

Please contact the claim handler listed above if you have any questions on this particular claim.

| Issue Date | Check Number | Total Amount of Check |
|---|---|---|
| 10-15-10 | 104156482 1 | $1,108.55 |

Please keep the above information for your records.

FOLD AT DOTTED LINE AND DETACH

0903378 44

HAR-100-2

THE HARTFORD

San Antonio Personal Lines Claim Service Center
P.O. Box 14261
Lexington, KY 40512-4261
1 800 236 0398 x 31065

001343
CYNTHIA WALKER
PO BOX 539
IOWA PARK, TX 76367

*Paid to 04/29/10 6-29-10*

**Attention:** This remittance incorporates
1 claim payments

**Special Handling ID:** RM 00

## Explanation of Benefits

Page 1 of 1

| Invoice Number | Claim Number/Date of Loss | Insured Name/Claimant Name | Amount Paid |
|---|---|---|---|
| | YYZAF 46136 06-09-10 | NORMAN WALKER NORMAN WALKER | $5,300.00 |

Service Dates

Nature of Payment: PIP coverage funeral benefit.
Additional Comments:

Paid on behalf of: Southern County Mutual
Claim Handler: Chris Williams
Claim Center: San Antonio Personal Lines Claim Service Center
P.O. Box 14261
Lexington, KY 40512-4261

1 800 236 0398 x 31065

Please contact the claim handler listed above if you have any questions on this particular claim.

| Issue Date | Check Number | Total Amount of Check |
|---|---|---|
| 06-23-10 | 103700587 2 | $5,300.00 |

088445964

01440

*200012 103700587 2*



THE HARTFORD

San Antonio Personal Lines Claim Service Center
P.O. Box 14261
Lexington, KY 40512-4261
1 800 236 0398 x 31065

000012
NORMAN E WALKER
1608 YUCCA ST
IOWA PARK, TX 76367

**Attention:** This remittance incorporates
1 claim payments

**Special Handling ID:** OM 00

## Explanation of Benefits

Page 1 of 1

| Invoice Number | Claim Number/ Date of Loss | Insured Name/ Claimant Name | Amount Paid |
|---|---|---|---|
| | YYZMD 44405 06-09-10 | NORMAN WALKER NORMAN WALKER | $20,317.10 |
| | | Service Dates | |

Nature of Payment: COMP LOSS LESS DED $ 75.00
Additional Comments: TOTAL LOSS SETTLEMENT

Paid on behalf of: Southern County Mutual
Claim Handler: Chris Williams
Claim Center: San Antonio Personal Lines Claim Service Center
P.O. Box 14261
Lexington, KY 40512-4261

1 800 236 0398 x 31065

Please contact the claim handler listed above if you have any questions on this particular claim.

| Issue Date | Check Number | Total Amount of Check |
|---|---|---|
| 07-02-10 | 1037397380 0 | $20,317.10 |

Please keep the above information for your records.

FOLD AT DOTTED LINE AND DETACH

08301069ᴱ

HAR-100-2

*400012 1037397380
00013



Δ π EXHIBIT 5
Deponent _____
Date _____
WWW.DEPOBOOK.COM

| Item | Model # | Serial # / VIN # | Value |
|---|---|---|---|
| Smith & Wesson Sigma 40 cal. | SW40VE | DTJ4064 | $350 |
| HP Laptop | G60-637GL | | $599 |
| Visio 22" TV | M260VA | LTMPGGAL1300635 | $350 |
| Tom Tom One GPS | | Z15157G00332 | $150 |
| iPod Nano (purple) | MB739LL | YM912RPR3QU | $149 |
| Toshiba 50" 1080p TV | | | $1,750.00 |
| Pink & white striped purse with id for Cynthia Walker | | | $150.00 |
| Clothes | | | $3,000 |
| Medication for C. Walker-hydrocodone-topomax-skelaxine-copaxone inj | | | $1,800.00 |
| Money | | | $3,500 |
| 14k Gold Mans wedding ring with 5 diamonds | size 11 | | $4,500 |
| W.F.P.D Retired ID and Badges for Cynthia Walker and Norman Walker | | | $650.00 |
| Diamond Hoop Earrings | | | $350 |
| Gold Mans citizen Watch (Engraved-WFPD Retired N.W. | | | $300 |
| Scuba Fins/ Goggles/Snorkle black w/ blue trim | | | $600 |
| Pet Yorkshire Terrier "Sweet T Pi" | | | $1,500 |
| Blanket Handmade by Jody Johnson (3) Quilts -Embroidered) | | | $750.00 |
| Towels, Housewares, dishes, pots and pans | | | $1,000 |
| Barbeque Grill - Weber | | | $75 |
| 2 Lounge Chairs | | | $150 |
| Money Clip with Id for Norman Walker with $600 | | | |
| 3 king size sheet sets | | | $359.00 |
| King comforter set | | | $150.00 |
| 2 queen size sheet sets | | | $ $99.99 |
| 1 queen comfortor set | | | $100.00 |
| 2 king size memory pillows | | | $258.00 |
| 1 cherry night stand w/iron designs | | | $99.00 |
| Craftsman tool chest & tools marked with dl of Norman Walker | | | $2,500.00 |
| Hydrolic bottle jack marked with dl of Norman Walker | | | $150.00 |
| 4 foot step ladder | | | $175.00 |
| Cosmetics | | | $250.00 |
| 2 lamps - $150.00 each | | | $300.00 |

| Item | Value |
|---|---|
| Tackle Box | $1,200.00 |
| Shakesphere Rod and Reel | $250.00 |
| 4 Pair of Nike Athletic shoes | $400.00 |
| Music CD's | $800.00 |
| Metal Detector | $150 |



# TAB 6

## Sec. 75.001. Definitions.

In this chapter:

**(1)** "Agricultural land" means land that is located in this state and that is suitable for:

**(A)** use in production of plants and fruits grown for human or animal consumption, or plants grown for the production of fibers, floriculture, viticulture, horticulture, or planting seed;

**(B)** forestry and the growing of trees for the purpose of rendering those trees into lumber, fiber, or other items used for industrial, commercial, or personal consumption; or

**(C)** domestic or native farm or ranch animals kept for use or profit.

**(2)** "Premises" includes land, roads, water, watercourse, private ways, and buildings, structures, machinery, and equipment attached to or located on the land, road, water, watercourse, or private way.

**(3)** "Recreation" means an activity such as:

**(A)** hunting;

**(B)** fishing;

**(C)** swimming;

**(D)** boating;

**(E)** camping;

**(F)** picnicking;

**(G)** hiking;

**(H)** pleasure driving, including off-road motorcycling and off-road automobile driving and the use of all-terrain vehicles and recreational off-highway vehicles;

**(I)** nature study, including bird-watching;

**(J)** cave exploration;

**(K)** waterskiing and other water sports;

**(L)** any other activity associated with enjoying nature or the outdoors;

**(M)** bicycling and mountain biking;

**(N)** disc golf;

**(O)** on-leash and off-leash walking of dogs; or

**(P)** radio control flying and related activities.

**(4)** "Governmental unit" has the meaning assigned by Section 101.001.

## History

Enacted by Acts 1985, 69th Leg., ch. 959 (S.B. 797), § 1, effective September 1, 1985; am. Acts 1989, 71st Leg., ch. 62 (H.B. 239), § *1*, effective September 1, 1989; am. Acts 1989, 71st Leg., ch. 736 (H.B. 1224), § *1*, effective September 1, 1989; am. Acts 1995, 74th Leg., ch. 520 (H.B. 2085), § *1*, effective August 28, 1995; am. Acts 1997, 75th Leg., ch. 56 (H.B. 2664), § *1*, effective September 1, 1997; am. Acts 2005, 79th Leg., ch. 116 (S.B. 1224), § *1*, effective September 1, 2005; am. Acts 2005, 79th Leg., ch. 932 (H.B. 616), § *1*, effective September 1, 2005; am. Acts 2007, 80th Leg., ch. 659 (H.B. 1183), § *1*, effective June 15, 2007; am. Acts 2015, 84th Leg., ch. HB2303 (H.B. 2303), § 1, effective June 19, 2015.

Texas Statutes & Codes Annotated by LexisNexis®
Copyright © 2015 Matthew Bender & Company, Inc.
a member of the LexisNexis Group. All rights reserved.

**End of Document**

## Sec. 75.002. Liability Limited.

**(a)** An owner, lessee, or occupant of agricultural land:

    **(1)** does not owe a duty of care to a trespasser on the land; and

    **(2)** is not liable for any injury to a trespasser on the land, except for wilful or wanton acts or gross negligence by the owner, lessee, or other occupant of agricultural land.

**(b)** If an owner, lessee, or occupant of agricultural land gives permission to another or invites another to enter the premises for recreation, the owner, lessee, or occupant, by giving the permission, does not:

    **(1)** assure that the premises are safe for that purpose;

    **(2)** owe to the person to whom permission is granted or to whom the invitation is extended a greater degree of care than is owed to a trespasser on the premises; or

    **(3)** assume responsibility or incur liability for any injury to any individual or property caused by any act of the person to whom permission is granted or to whom the invitation is extended.

**(c)** If an owner, lessee, or occupant of real property other than agricultural land gives permission to another to enter the premises for recreation, the owner, lessee, or occupant, by giving the permission, does not:

    **(1)** assure that the premises are safe for that purpose;

    **(2)** owe to the person to whom permission is granted a greater degree of care than is owed to a trespasser on the premises; or

    **(3)** assume responsibility or incur liability for any injury to any individual or property caused by any act of the person to whom permission is granted.

**(d)** Subsections (a), (b), and (c) shall not limit the liability of an owner, lessee, or occupant of real property who has been grossly negligent or has acted with malicious intent or in bad faith.

**(e)** In this section, "recreation" means, in addition to its meaning under Section 75.001, the following activities only if the activities take place on premises owned, operated, or maintained by a governmental unit for the purposes of those activities:

    **(1)** hockey and in-line hockey;

    **(2)** skating, in-line skating, roller-skating, skateboarding, and roller-blading;

    **(3)** soap box derby use; and

    **(4)** paintball use.

**(f)** Notwithstanding Subsections (b) and (c), if a person enters premises owned, operated, or maintained by a governmental unit and engages in recreation on those premises, the governmental unit does not owe to the person a greater degree of care than is owed to a trespasser on the premises.

**(g)** Any premises a governmental unit owns, operates, or maintains and on which the recreational activities described in Subsections (e)(1)—(4) are conducted shall post and maintain a clearly readable sign in a clearly visible location on or near the premises. The sign shall contain the following warning language:

**WARNING**

**WARNING**TEXAS LAW (CHAPTER 75, CIVIL PRACTICE AND REMEDIES CODE) LIMITS THE LIABILITY OF A GOVERNMENTAL UNIT FOR DAMAGES ARISING DIRECTLY FROM HOCKEY, IN-LINE HOCKEY, SKATING, IN-LINE SKATING, ROLLER-SKATING, SKATEBOARDING, ROLLER-BLADING, PAINTBALL USE, OR SOAP BOX DERBY USE ON PREMISES THAT THE GOVERNMENTAL UNIT OWNS, OPERATES, OR MAINTAINS FOR THAT PURPOSE.

**(h)** An owner, lessee, or occupant of real property in this state is liable for trespass as a result of migration or transport of any air contaminant, as defined in *Section 382.003(2), Health and Safety Code*, other than odor, only upon a showing of actual and substantial damages by a plaintiff in a civil action.

**(i)** Subsections (b) and (c) do not affect any liability of an owner, lessee, or occupant of real property for an injury occurring outside the boundaries of the real property caused by an activity described by Section 75.001(3)(P) that originates within the boundaries of the real property.

## History

Enacted by Acts 1985, 69th Leg., ch. 959 (S.B. 797), § 1, effective September 1, 1985; am. Acts 1989, 71st Leg., ch. 62 (H.B. 239), § *2*, effective September 1, 1989; am. Acts 1997, 75th Leg., ch. 56 (H.B. 2664), § *2*, effective September 1, 1997; am. Acts 1999, 76th Leg., ch. 734 (H.B. 1058), § *1*, effective September 1, 1999; am. Acts 2003, 78th Leg., ch. 204 (H.B. 4), § *21.01*, effective September 1, 2003; am. Acts 2003, 78th Leg., ch. 739 (H.B. 3248), § *1*, effective September 1, 2003; am. Acts 2005, 79th Leg., ch. 116 (S.B. 1224), § *2*, effective September 1, 2005; am. Acts 2005, 79th Leg., ch. 932 (H.B. 616), § *2*, effective September 1, 2005; am. Acts 2007, 80th Leg., ch. 227 (H.B. 1560), § *1*, effective May 25, 2007; am. Acts 2007, 80th Leg., ch. 659 (H.B. 1183), § *2*, effective June 15, 2007.

Texas Statutes & Codes Annotated by LexisNexis®
Copyright © 2015 Matthew Bender & Company, Inc.
a member of the LexisNexis Group. All rights reserved.

## Sec. 75.003. Application and Effect of Chapter.

**(a)** This chapter does not relieve any owner, lessee, or occupant of real property of any liability that would otherwise exist for deliberate, wilful, or malicious injury to a person or to property.

**(b)** This chapter does not affect the doctrine of attractive nuisance, except:

**(1)** as provided by Section 75.0022(g) or 75.0025(c); and

**(2)** the doctrine of attractive nuisance may not be the basis for liability of an owner, lessee, or occupant of agricultural land for any injury to a trespasser over the age of 16 years.

**(c)** Except for a governmental unit, this chapter applies only to an owner, lessee, or occupant of real property who:

**(1)** does not charge for entry to the premises;

**(2)** charges for entry to the premises, but whose total charges collected in the previous calendar year for all recreational use of the entire premises of the owner, lessee, or occupant are not more than 20 times the total amount of ad valorem taxes imposed on the premises for the previous calendar year; or

**(3)** has liability insurance coverage in effect on an act or omission described by Section 75.004(a) and in the amounts equal to or greater than those provided by that section.

**(d)** This chapter does not create any liability.

**(e)** Except as otherwise provided, this chapter applies to a governmental unit.

**(f)** This chapter does not waive sovereign immunity.

**(g)** To the extent that this chapter limits the liability of a governmental unit under circumstances in which the governmental unit would be liable under Chapter 101, this chapter controls.

**(h)** In the case of agricultural land, an owner, lessee, or occupant of real property who does not charge for entry to the premises because the individuals entering the premises for recreation are invited social guests satisfies the requirement of Subsection (c)(1).

## History

Enacted by Acts 1985, 69th Leg., ch. 959 (S.B. 797), § 1, effective September 1, 1985; am. Acts 1987, 70th Leg., ch. 832 (H.B. 1032), § *5*, effective September 1, 1987; am. Acts 1989, 71st Leg., ch. 62 (H.B. 239), § *3*, effective September 1, 1989; am. Acts 1995, 74th Leg., ch. 520 (H.B. 2085), § *2*, effective August 28, 1995; am. Acts 1997, 75th Leg., ch. 56 (H.B. 2664), § *3*, effective September 1, 1997; am. Acts 2003, 78th Leg., ch. 429 (H.B. 408), § *1*, effective September 1, 2003; am. Acts 2013, 83rd Leg., ch. 44 (H.B. 200), § *4*, effective May 16, 2013; am. Acts 2015, 84th Leg., ch. HB262 (H.B. 262), § 2, effective September 1, 2015.

Texas Statutes & Codes Annotated by LexisNexis®
Copyright © 2015 Matthew Bender & Company, Inc.

a member of the LexisNexis Group. All rights reserved.

**End of Document**

*Texas Statutes & Codes Annotated by LexisNexis® > Civil Practice and Remedies Code > Title 4 Liability In Tort > Chapter 75 Limitation of Landowners' Liability*

## Sec. 75.004. Limitation on Monetary Damages for Private Landowners.

**(a)** Subject to Subsection (b), the liability of an owner, lessee, or occupant of agricultural land used for recreational purposes for an act or omission by the owner, lessee, or occupant relating to the premises that results in damages to a person who has entered the premises is limited to a maximum amount of $500,000 for each person and $1 million for each single occurrence of bodily injury or death and $100,000 for each single occurrence for injury to or destruction of property. In the case of agricultural land, the total liability of an owner, lessee, or occupant for a single occurrence is limited to $1 million, and the liability also is subject to the limits for each single occurrence of bodily injury or death and each single occurrence for injury to or destruction of property stated in this subsection.

**(b)** This section applies only to an owner, lessee, or occupant of agricultural land used for recreational purposes who has liability insurance coverage in effect on an act or omission described by Subsection (a) and in the amounts equal to or greater than those provided by Subsection (a). The coverage may be provided under a contract of insurance or other plan of insurance authorized by statute. The limit of liability insurance coverage applicable with respect to agricultural land may be a combined single limit in the amount of $1 million for each single occurrence.

**(c)** This section does not affect the liability of an insurer or insurance plan in an action under Chapter 541, Insurance Code, or an action for bad faith conduct, breach of fiduciary duty, or negligent failure to settle a claim.

**(d)** This section does not apply to a governmental unit.

## History

Enacted by Acts 1995, 74th Leg., ch. 520 (H.B. 2085), § *3*, effective August 28, 1995; am. Acts 1997, 75th Leg., ch. 56 (H.B. 2664), § *4*, effective September 1, 1997; am. Acts 2005, 79th Leg., ch. 728 (H.B. 2018), § *11.106*, effective September 1, 2005.

Texas Statutes & Codes Annotated by LexisNexis®
Copyright © 2015 Matthew Bender & Company, Inc.
a member of the LexisNexis Group. All rights reserved.

**End of Document**